Filed 3/17/16

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| TENET HEALTHSYSTEM DESERT, INC., | D069057 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. INC1303739) |
| BLUE CROSS OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Riverside County, John G. Evans, Judge.  Reversed and remanded.


Helton Law Group, Carrie S. McLain, Kim M. Worobec, Teddy T. Davis and Patrick S. Ludeman for Plaintiff and Appellant.

Morgan, Lewis & Bockius, Thomas M. Peterson, Molly M. Lane and Lisa R. Veasman for Defendants and Respondents.

I

INTRODUCTION

Plaintiff Tenet Healthsystem Desert, Inc. (Hospital)[1] appeals from a judgment entered in favor of defendants Blue Cross of California, doing business as Anthem Blue Cross (Blue Cross), Anthem Blue Cross Life and Health Insurance Company (BC Life), and Anthem UM Services, Inc. (Anthem UM).[2] Hospital sued Anthem, as well as Eisenhower Medical Center (Eisenhower) and Keenan & Associates (Keenan), when the defendants refused to pay approximately $1,996,265.50 for the cost of medical services that Hospital provided to an insured patient following extensive communications with Anthem over a period of approximately 50 days regarding "authorization" for the services. The defendants ultimately denied coverage for the medical services based on an exclusion in the patient's policy for injuries sustained as a result of having a blood alcohol level over the legal limit. Hospital alleged that Anthem's continuing to "authorize" medical services during the patient's stay at Hospital, even after Anthem was made aware that the patient was admitted with a blood alcohol level far exceeding the legal limit, constituted a misrepresentation as to coverage, on which Hospital relied in providing care to the patient.

The trial court entered judgment for Anthem after sustaining, without leave to amend, Anthem's demurrer to Hospital's third amended complaint (TAC) with respect to

---

[1]     Plaintiff does business as Desert Regional Medical Center.

[2]     We will refer to Blue Cross, BC Life and Anthem UM collectively as "Anthem."

the causes of action alleged against Anthem.[3]  The trial court determined that the TAC

lacked the necessary specificity to survive a demurrer.

We conclude that the trial court erred.  The TAC alleges facts with sufficient

particularity to overcome a demurrer.  We therefore reverse the judgment and remand the

matter to the trial court for further proceedings.

II

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*[4]

A patient (Patient X) was treated in Hospital's acute care facility after an

automobile accident that occurred in the days prior to May 7, 2012.[5]  Patient X had a

"member identification card," which "identifie[d] that the Patient has health care

coverage through a plan sponsored by Eisenhower."  Patient X's "member identification

card identified BC Life and Keenan as Eisenhower's authorized agent[s] and

administrator[s] of Eisenhower's plan," and "further identified Blue Cross as

---

[3]    The trial court did grant Hospital 30 days to amend a single cause of action against Anthem.  Hospital elected to forego further amendment in favor of appealing the trial court's ruling on the demurrer.

[4]    Because we are reviewing the trial court's ruling on a demurrer to an operative pleading, our recitation of the factual background of this matter is derived from the allegations set forth in that pleading.

[5]    The TAC does not state the exact date of Patient X's admission, but does allege that "on or about May 7, 2012, at approximately 11:00 a.m., the Hospital's admissions assistant Patricia West telephoned and spoke with Aileen A. at (800) 274-7767 to provide notice of the Patient's admission for post-stabilization services in the Hospital's acute care hospital and to request authorization for the Hospital to provide post-stabilization services to the Patient."

Eisenhower's and BC Life's authorized agent and administrator who administers claims under Eisenhower's plan on behalf of BC Life."

According to the allegations of the TAC, Anthem, Eisenhower and Keenan had an agreement under which the Anthem entities and Keenan would act as Eisenhower's agent in order to perform all of the administrative services on behalf of Eisenhower's "Health Plan ERISA Trust," which "provides health care benefits for employees of Eisenhower Medical Center and their family members," a group to which we infer, based on the allegations of the TAC, Patient X belonged. These administrative services are alleged to include "all communications and direct dealings with providers, such as the Hospital, including but not limited to verification of eligibility, benefits and authorization of services; negotiating with providers, such as the Hospital, concerning any matters including the entering into and/or revisions to contracts; pricing claims in accordance with the terms of the plan documents and Summary Plan Description; producing member identification cards; conducting utilization review; processing authorizations of services and responding to providers' requests for such authorizations; and coordination and management of medical care through case management."

Hospital alleges that all of the defendants "had actual knowledge of the terms of the Plan's coverage, including exclusions." Further, Hospital notes that it "does not and could not possibly maintain information regarding all exclusions from coverage for the tens (if not hundreds) of thousands of health insurance plans that cover the patients the Hospital treats each year . . . ."

4

Hospital specifically alleges that there exists "a trade custom and usage that, to the extent that a health plan and its administrators have information indicating that services are not covered under the plan, the health plan and its administrators do not authorize such services."  According to the operative pleading, the trade usage and custom is "that *an authorization of services* constitutes an affirmative representation that, based on all of the information the health plan has been provided to date, the services are *covered*." (Italics added.)  Even more specifically, Hospital alleges that there had been a "course of dealing between the Hospital and [all the defendants] such that, to the extent that [the defendants] have information indicating that services are not covered under the plan, [the defendants] do not authorize such services.  Accordingly, at all times mentioned there has existed a course of dealing between the Hospital and [the defendants] that an authorization of services constitutes an affirmative representation that, based on all of the information the health plan has been provided to date, the services are covered.  This course of dealing is, and at all times mentioned has been, certain and uniform, of general continuity and well known to the Hospital and to [the defendants]."

The operative pleading alleges that a representative of Hospital called 800-274-7767, which is the telephone number that was provided on Patient X's member identification card "as the number to call for 'Pre-Authorization,' " and which is a number that Hospital was informed and believes is answered "by individuals who are the agents of Eisenhower and the employees and agents of [Anthem and] Keenan."

On the morning of May 7, 2012, a Hospital admissions assistant called the 800-274-7767 number and spoke with "Aileen A." to provide notice that Patient X had been

5

admitted to the acute care hospital within Hospital for "post-stabilization services." Aileen A. gave the Hospital admissions assistant "reference number 0225239133 and requested that the Hospital fax a clinical review of the Patient's medical condition to (888) 391-3134." Aileen A. possessed certain private information about Patient X, such as his name and date of birth, that she and Anthem and Keenan "would not have had if they were not . . . agents [of Eisenhower]." In addition, Hospital was informed and believed that Anthem and Keenan hold out "fax number (888) 391-3134" as a number they use "to communicate with providers regarding information necessary to authorize care and make coverage determinations on behalf of Eisenhower."

That afternoon, a Hospital case manager faxed to the number Aileen A. had provided "a clinical review of the Patient's medical condition as of the date of service May 7, 2012." The clinical summary included information that Patient X had been brought to the emergency room by ambulance after having been in a motor vehicle accident in which he was an unrestrained driver, and that he had "tested positive for cannabis and a blood alcohol level ('ETOH' for ethyl alcohol) of .235."

On the morning of May 8, Hospital's representatives attempted to verify Patient X's benefit summary through a Web site maintained by Anthem, on behalf of Eisenhower. The Web site did not disclose the existence of an exclusion for services for injuries sustained as a result of a participant's driving with a blood alcohol level in excess of the legal limit.

Anthem repeatedly requested clinical information pertaining to Patient X over the course of a multi-week period. Between May 7 and June 11, 2012, Anthem authorized

6

Patient X's ICU treatment, in writing, on at least 11 occasions. Many of the authorization letters included letterhead and documents containing the defendants' trademarks. For example, on May 8, Hospital received a telephone call and a letter via fax from an unnamed case manager employed by Anthem. The case manager "authoriz[ed]" Hospital to admit Patient X and to provide medical services to him "at the ICU level of care." The letter identified the case manager as an employee of Anthem, identified that the fax was sent on Anthem's behalf, and included private information about the patient that an individual would not have possessed if he or she were not an agent of Anthem. The letter did not advise Hospital that Patient X's plan excluded coverage for services provided to treat injuries sustained when a plan participant was driving with a blood alcohol level over the legal limit, nor did the case manager inform Hospital of this fact over the telephone.

On or about May 9, 2012, Hospital received a letter via fax from an unnamed case manager for Anthem "authorizing" services for Patient X through May 10 in the ICU. This letter "failed to identify that the plan had any exclusion from coverage applicable to injuries caused by a motor vehicle accident in which the Patient was driving with a blood alcohol level in excess of the legal limit."

On or about May 11, Hospital received a letter via fax from an unnamed case manager for Anthem "authorizing" medical services for Patient X through May 12 in the ICU. This correspondence did not identify a potentially applicable exclusion from coverage for the services.

7

On or about May 14, 2012, Dionne Myers, a case manager for Anthem, corresponded with Hospital's admissions assistant Patricia West. Myers requested additional clinical information regarding Patient X's health status in order to determine whether additional medical treatment would be authorized.

No later than May 15, Patient X's case was referred to a "discharge planner" for Anthem, Nell Steele-Alvarez. Steele-Alvarez was to make arrangements for where Patient X would go for rehabilitation after being discharged from the acute care hospital. Steele-Alvarez was provided with clinical information regarding Patient X, which she reviewed, and was aware that Patient X's injuries had resulted from a vehicle accident that occurred while he was driving with a blood alcohol level in excess of the legal limit. Steele-Alvarez informed Hospital's case manager Janet Sobleskie that she was "investigating acute rehab facilities where the Patient would go when the Patient was discharged from [Hospital's] acute care hospital."

Later that day, Hospital received another letter via fax from an unnamed case manager for Anthem authorizing medical services for Patient X in the ICU through May 17. This correspondence did not inform Hospital of the coverage exclusion for injuries sustained as a result of driving with an illegal blood alcohol level.

On May 16, Hospital documented that "it was not reviewing the Patient's account for potential alternative health care coverage because the existence of Patient's insurance coverage had been confirmed."

Hospital received additional faxed letters from representatives of Anthem on May 16, May 18, May 25, May 30, May 31, June 4, June 6 (two letters), and June 11,

8

"authorizing" medical care for Patient X in the ICU. None of these letters informed Hospital of the relevant exclusion.

In the meantime, Anthem discharge planner Steele-Alvarez telephoned Hospital from telephone number 818-234-6095 on May 17 and May 22 to discuss with Hospital's case manager Sobleskie the plan for Patient X's rehabilitation care after his discharge from the ICU.[6] Steele-Alvarez discussed with Sobleskie Patient X's medical condition, clinical information, and discharge planning. On June 12, Steele-Alvarez called Hospital from the same telephone number and spoke with a nurse case manager regarding facilities where Patient X could be sent pursuant to the terms of his coverage following his discharge from the ICU. Steele-Alvarez discussed Patient X's medical condition, the basis for his admission, the nature of his injuries, and discharge plans.

On June 15, Steele-Alvarez, again calling from 818-234-6095, spoke with Hospital's rehabilitation case manager Robyn Angeli. Steele-Alvarez requested that Patient X be admitted to Hospital's acute inpatient rehabilitation hospital upon his discharge from the ICU, and authorized the admission. The operative pleading alleges that in engaging in this communication with Angeli, Steele-Alvarez was acting as the agent and employee of Anthem, and that she was acting as the agent of Eisenhower as well.

On June 18, 2012, Hospital discharged Patient X from the acute care hospital and, based on the representations by Steele-Alvarez regarding authorization for Patient X's

---

6    The operative pleading alleges not only the dates but the times that many of the contacts between Hospital's representatives and representatives of Anthem occurred.

9

treatment in Hospital's acute rehabilitation facility, transferred and admitted Patient X as an inpatient at its acute rehabilitation hospital.

On June 20, an unnamed case manager for Anthem sent Hospital a letter on Anthem letterhead authorizing the provision of acute rehabilitation services to Patient X through June 25. That same date, Dionne Myers spoke with a representative of Hospital and verbally indicated that Hospital's provision of acute rehabilitation services to Patient X was authorized under the terms of his plan until June 25.

The operative pleading alleges that Anthem and the other defendants made these communications when they "knew or should have known the clinical information previously provided by Hospital, which specifically indicated that the Patient was injured while driving in an automobile accident with a blood alcohol level in excess of the legal limit and positive for cannabis, and that they knew or should have known of the exclusions from coverage, including for injuries caused by a motor vehicle accident in which the patient was driving with a blood alcohol level in excess of the legal limit." As a result of a contractual agreement between Eisenhower and Anthem, Anthem knew of and was in possession of the terms of Patient X's plan, including the exclusions from coverage.

In addition, the operative pleading alleges that all of the defendants "falsely represented that the Hospital's acute rehabilitation hospital services it had provided, was providing, and would provide to the Patient [were] covered under the Patient's plan and that the Plan is financially responsible for paying for such services." The pleading further alleges that the representations made by the defendants were false, and that at the time the

10

representations were made, the defendants had no reasonable ground for believing them to be true. The operative pleading alleges that the defendants made these misrepresentations that the services "were authorized and covered with the intent to induce the Hospital to act in reliance on them . . . , or with the expectation that the Hospital would so act."

Hospital alleges that it was ignorant of the falsity of the representations made by the defendants, believed them to be true, and acted in reliance on them in admitting Patient X to its acute rehabilitation facility and providing services to him there.

Hospital was not informed of the existence of the exclusion for coverage in Patient X's plan for "injuries sustained while drinking and driving" until October 24, 2012.[7] Hospital contends that, as a result, Hospital was denied payment for the more than 50 days of services that Hospital rendered to Patient X in its ICU and acute rehabilitation facility. In addition, because Hospital was not informed of the coverage exclusion until late October 2012, Hospital was unable to seek reimbursement via Medi-Cal because claims for Medi-Cal must be submitted within 60 days from the date the services were rendered.

B.      *Procedural background*

Hospital filed a complaint against Anthem, Eisenhower, and Keenan alleging 14 causes of action in June 2013. After demurrers and amendments, Hospital filed a second amended complaint (SAC) in November 2013.

---

[7]     The operative pleading does not allege who specifically informed Hospital of the exclusion on October 24, 2012.

Anthem filed a demurrer to the SAC, in which Eisenhower and Keenan joined. The trial court sustained this demurrer, as well, and granted Hospital 30 days leave to amend. The trial court acknowledged that in the first, second and third causes of action, Hospital had identified several people by name. However, the court faulted Hospital for failing to "allege specifically who the persons with whom plaintiff spoke, work for or were representing, to whom the phone numbers belonged or who assigned the claim number."

Hospital filed the TAC in January 2014. The 276-page pleading outlines Hospital's interaction with individuals, over a period of approximately 50 days, who held themselves out as representing Anthem for purposes of reviewing and authorizing the medical care provided to Patient X. The allegations in the TAC include dates, times, the manner of communication, including correspondence, faxes and telephone calls, together with telephone and fax numbers utilized, the names of individuals and their titles, if known, the companies these individuals represented, and the factual basis for Hospital's belief that an agency relationship existed. In the TAC, Hospital pled causes of action against Anthem for negligent misrepresentation; fraud and deceit based on suppression of facts; intentional fraud; and unfair business practices in violation of Business and Professions Code section 17200.[8]

Anthem filed a demurrer to the TAC, and the trial court again ruled that Hospital had failed to "plead fraud/misrepresentation with the requisite specificity," and failed to

---

[8]    The TAC alleged 19 causes of action in total against the various defendants.

12

"set forth a single actual specific misrepresentation that was made by [Anthem] that the patient was covered." The court references pages 24 through 52 of the TAC in support of its conclusion that the TAC lacked an allegation of a misrepresentation. The trial court sustained Anthem's demurrer with respect to Hospital's causes of action for negligent misrepresentation (causes of action 1 and 10), fraud based on suppression of facts (causes of action 2 and 11), and intentional fraud (causes of action 3 and 12). This time, the court denied leave to amend, except with regard to the unfair business practices cause of action (cause of action 19), for which the court granted Hospital an additional 30 days in which to amend to attempt to plead that cause of action.[9]

Hospital elected not to file another amended pleading with respect to the unfair business practices cause of action, instead reserving its right to appeal the ruling on the demurrer to the TAC. As a result, the trial court filed an order dismissing the action against Anthem with prejudice, and entered judgment in favor of Anthem in April 2014.

Hospital filed a timely notice of appeal.

III

DISCUSSION

A. *Legal standards on appeal from the sustaining of a demurrer without leave to amend*

We apply the following well-established law in reviewing a trial court's order sustaining a demurrer without leave to amend: "We independently review the ruling on a

---

[9] In this order, the trial court also denied Anthem's request for judicial notice of letters it purportedly sent to Hospital while Patient was in the hospital. The court noted that "[t]he contents of the letters are not the proper subject of judicial notice."

13

demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action. [Citation.] We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and matters of which judicial notice has been taken. [Citation.] We construe the pleading in a reasonable manner and read the allegations in context." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111 (*Fremont*).)

When the trial court sustains a demurrer without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

B.    *Analysis*

1.    *Anthem improperly relies on evidence not in the record throughout its briefing*

As an initial matter, we must address the impropriety of Anthem's reliance on certain evidence, throughout its response brief, in attempting to demonstrate that the trial court ruled correctly in sustaining its demurrer. Anthem repeatedly refers to the contents of letters that it alleges are letters that it sent to Hospital with respect to Patient X's care. Anthem asks this court to "look at what the writings actually stated when they conveyed to Hospital the allegedly actionable misrepresentations," in an effort to demonstrate that

14

the writings referred to in the TAC "show[ ] something quite different from the misimpression Hospital has created by its incomplete and vague pleading tactics[.]"

Anthem's request that this court "look at what the writings actually stated" is inappropriate. Because a demurrer challenges defects *on the face of the complaint*, it can refer to matters outside the pleading only if those matters are subject to judicial notice. (*Blank*, *supra*, 39 Cal.3d at p. 318.)

The letters at issue were not incorporated into the operative pleading, and the trial court declined to take judicial notice of the letters and thus did not consider them in ruling on Anthem's demurrers.[10] Anthem does not argue on appeal that the trial court erred in denying Anthem's request for judicial notice. The letters are therefore not properly before this court on the basis that the trial court judicially noticed them. Further, Anthem does not properly request that this court take judicial notice of the documents independently. Although Anthem argues in its briefing on appeal that the letters are "relevant" to Hospital's claims and that this court "may evaluate" and/or "properly/consider and judicially notice" them, an argument raised in a response brief is insufficient to permit this court to take judicial of the evidence that is the subject of such argument. (Formatting omitted.) If a party wants this court to take judicial notice of a matter, that party must file a motion seeking judicial notice *in this court*, as required by California Rules of Court, rule 8.252:

---

10    Again, the trial court concluded that "the letters are not the proper subject of judicial notice."

"(1) To obtain judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order.

"(2) The motion must state:

"(A) Why the matter to be noticed is relevant to the appeal;

"(B) Whether the matter to be noticed was presented to the trial court and, if so, whether judicial notice was taken by that court;

"(C) If judicial notice of the matter was not taken by the trial court, why the matter is subject to judicial notice under Evidence Code section 451, 452, or 453; and

"(D) Whether the matter to be noticed relates to proceedings occurring after the order or judgment that is the subject of the appeal."

Anthem has not filed a separate motion that complies with these requirements. This, alone, would be a sufficient reason to reject Anthem's request that this court consider the contents of the letters; however, even if Anthem had properly requested that this court take judicial notice of the letters, we would have ruled in the same way that the trial court did. The letters that Anthem seeks to introduce are not matters that are properly subject to judicial notice.

" 'Judicial notice may not be taken of any matter unless authorized or required by law.' (Evid. Code, § 450.) Matters that are subject to judicial notice are listed in Evidence Code sections 451 and 452. A matter ordinarily is subject to judicial notice only if the matter is reasonably beyond dispute." (*Fremont, supra,* 148 Cal.App.4th at p. 113.) Neither the existence of the letters that Anthem is relying on, nor the content of such letters, falls within any of the matters identified as those as to which judicial notice

16

must be taken pursuant to Evidence Code section 451,[11] or matters identified as those as to which judicial notice may be taken pursuant to section 452.[12]

---

[11] Evidence Code section 451 provides:

"Judicial notice shall be taken of the following:

"(a) The decisional, constitutional, and public statutory law of this state and of the United States and the provisions of any charter described in Section 3, 4, or 5 of Article XI of the California Constitution.

"(b) Any matter made a subject of judicial notice by Section 11343.6, 11344.6, or 18576 of the Government Code or by Section 1507 of Title 44 of the United States Code.

"(c) Rules of professional conduct for members of the bar adopted pursuant to Section 6076 of the Business and Professions Code and rules of practice and procedure for the courts of this state adopted by the Judicial Council.

"(d) Rules of pleading, practice, and procedure prescribed by the United States Supreme Court, such as the Rules of the United States Supreme Court, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, the Admiralty Rules, the Rules of the Court of Claims, the Rules of the Customs Court, and the General Orders and Forms in Bankruptcy.

"(e) The true signification of all English words and phrases and of all legal expressions.

"(f) Facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute."

[12] Evidence Code section 452 provides:

"Judicial notice may be taken of the following matters to the extent that they are not embraced within Section 451:

17

The only arguable "matter" identified in the relevant Evidence Code provisions under which these letters could fall would be those matters identified in subdivision (h) of Evidence Code section 452: "Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." However, letters that were ostensibly created by a party to the litigation regarding the subject of the litigation would appear to be the very epitome of items "subject to dispute," as opposed to "*not* reasonably subject to dispute."

"(a) The decisional, constitutional, and statutory law of any state of the United States and the resolutions and private acts of the Congress of the United States and of the Legislature of this state.

"(b) Regulations and legislative enactments issued by or under the authority of the United States or any public entity in the United States.

"(c) Official acts of the legislative, executive, and judicial departments of the United States and of any state of the United States.

"(d) Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.

"(e) Rules of court of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.

"(f) The law of an organization of nations and of foreign nations and public entities in foreign nations.

"(g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute.

"(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

18

(*Ibid.*, italics added.) Further, although the *existence* of a document, such as a document recorded in the official records of a government body, may be judicially noticeable, the truth of statements contained in the document and *their proper interpretation* are not subject to judicial notice. (*StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 457, fn. 9 ["In ruling on a demurrer, a court may consider facts of which it has taken judicial notice. (Code Civ. Proc., § 430.30, subd. (a).) This includes the existence of a document. When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable."].) As a result, even if we were to conclude that it would be proper to take judicial notice of the *existence* of the letters to which Anthem repeatedly cites, the existence of the letters would offer Anthem no assistance in supporting its position that Hospital's TAC fails to state any valid causes of action, since Anthem's position is premised on its own interpretation of the meaning of the letters.[13]

Because the evidence regarding the contents of these letters is not properly the subject of judicial notice and, in fact, no judicial notice has been taken of these letters by

---

[13]     For example, Anthem claims that the letters "directly contradict Hospital's allegations" in the TAC regarding the proper meaning of Anthem's "authorizations." Anthem also asserts that an evaluation of these letters makes the "sham nature of Hospital's allegations . . . immediately apparent." (Capitalization and boldface omitted.) If anything, Anthem's argument demonstrates why such matters are not properly considered on a demurrer, since the content of the letters can do no more than raise a triable issue of fact with respect to whether Anthem made material misrepresentations or concealed material facts. A demurrer is not the appropriate vehicle for challenging *the merits of a plaintiff's case*.

19

either the trial court or this court, the letters are not properly before us.[14] We will

therefore ignore any and all references to these letters in Anthem's briefing on appeal.

Such letters do not, and cannot, provide a basis for affirming the trial court's ruling with

respect to Anthem's demurrer.[15]

---

[14] Anthem's reliance on *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1285, footnote 3 (*Ingram*), is misplaced. In *Ingram*, the appellate court took judicial notice of a "letter and media release (which were substantially the same)" issued by a district attorney's office regarding the results of an investigation into potential Brown Act violations by public officials. (*Id.* at pp. 1284, 1285, fn. 3.) The documents had not been attached to the operative complaint. However, unlike in this case, the complaint had "excerpted quotes from the letter and summarized parts of it in some detail." (*Id.* at p. 1285, fn. 3.) Even more significantly, the appellant in *Ingram* had not opposed the court taking judicial notice of the documents. (*Id.* at p. 1285, fn. 3.) The appellate court appears to have accepted the appellant's concession that such material was properly the subject of judicial notice without undertaking an independent analysis as to the propriety of taking judicial notice. (*Ibid.*) We therefore do not consider *Ingram* to be useful authority for purposes of this case.

[15] At oral argument, counsel for Anthem suggested that the TAC is deficient because Hospital failed to include the full text of the written communications alleged to have been sent from Anthem to Hospital, or to attach a copy of the communications. Relying on *Holly Sugar Corp. v. Johnson* (1941) 18 Cal.2d 218, counsel's position at oral argument was that when a fraud cause of action is predicated on a writing, the complaint must include the full text of such a writing or attach a copy. We note that this position is slightly different from the position taken in briefing, in which Anthem simply argued that this court could consider the letters that Anthem contends are the writings containing some of the alleged misrepresentations because "[a] cause of action predicated on a writing—and here allegedly actionable misrepresentations are in writing—will ordinarily plead what the writings state, or attach the writings to the complaint, or incorporate them by reference." This is not an argument that Hospital's pleading is necessarily deficient because it does not include the full text of the writings or attach a copy. Further, the authority on which Anthem relies does not stand for the proposition that a pleading alleging fraud is deficient if it does not include a copy of the writing in which an alleged misrepresentation was made, either in the text of the complaint or by attaching a copy to the complaint. Rather, the authority simply stands for the rule that a party *may* simply quote from a document or attach a copy, rather than *plead the legal effect of the document*: "It is well settled that a written instrument which is the foundation of a cause

2. *Intentional fraud (causes of action 3 and 12)*

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] [¶] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar*, *supra*, 12 Cal.4th at p. 645.) In addition, a plaintiff is held to a higher standard in asserting a fraud claim against a corporate defendant. "In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.' " (*Ibid.*)

"The specificity requirement serves two purposes. The first is notice to the defendant, to 'furnish the defendant with certain definite charges which can be

---

of action may be pleaded in haec verba, rather than according to its legal effect, either by setting forth a copy in the body of the complaint or by attaching a copy as an exhibit and incorporating it by proper reference." (*Id.* at p. 225, italics omitted.) Finally, even if there existed a requirement that Hospital set forth in its complaint the full text of the letters in which it contends the misrepresentations were made, such that this court could consider the text of the letters as Anthem has requested it do, the letters do not, in and of themselves, establish as a matter of law that there was no representation of coverage.

21

intelligently met.' [Citations.] The pleading of fraud, however, is also the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings. Thus the pleading should be sufficient ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217 (*Committee on Children's Television*).)

There exist, however, "certain exceptions which mitigate the rigor of the rule requiring specific pleading of fraud." (*Committee on Children's Television*, *supra*, 35 Cal.3d at p. 217.) For example, less specificity is required of a complaint when " 'it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy,' [citation]; '[e]ven under the strict rules of common law pleading, one of the canons was that less particularity is required when the facts lie more in the knowledge of the opposite party . . . .' " (*Ibid.*, italics added.)

Hospital has sufficiently met the pleading requirements for intentional fraud. First, Hospital identifies multiple written and oral communications, made by the Anthem entities and expressed to Hospital, in which Anthem authorized the services that Hospital provided to Patient X. As to a large number of communications, Hospital alleges the dates, times, and the names of the individuals who initiated these communications, which occurred over a period of approximately 50 days. Moreover, Hospital identifies at least one conversation between Anthem discharge planner Steele-Alvarez and a Hospital

22

representative in which Steele-Alvarez, alleged to be an employee and/or agent of one or more of the Anthem defendants, not only authorized but specifically *requested* that Hospital admit Patient X to its acute rehabilitation facility upon his discharge from Hospital's ICU.  Hospital has thus clearly pled facts that show how the statements were made (directly to agents of Hospital through telephone calls and written letters faxed to Hospital); when the statements were made (on the identified dates and the specified times); where the statements were made (at Hospital, where its representatives received the communications); to whom the statements were made (to identified Hospital employees); and the means by which they were made (by way of telephone calls placed and letters faxed from numbers that are alleged to belong to defendants).  (See *Lazar*, *supra*, 12 Cal.4th at p. 645 [pleading with particularity necessitates pleading that " ' "show[s] how, when, where, to whom, and by what means the representations were tendered" ' "].)  Further, Hospital alleged the identities of certain individuals acting as the agents of Anthem, and further provided the basis for the allegation that such individuals had the authority to act on Anthem's behalf, including the fact that these individuals were originally reached through Hospital's call to the number provided on Patient X's member identification card, and that these individuals possessed private health and identifying information about Patient X that they would not have been in possession of absent their employment/agency relationship with Anthem.

Given the specificity of these numerous alleged communications, and given the allegation that the provision of an "authorization" has a specific meaning in this context, i.e., that an "authorization of services constitutes an affirmative representation that . . . the

23

services are covered," Hospital has sufficiently alleged the existence of multiple affirmative misrepresentations that the care that Hospital rendered to Patient X would be covered by his insurance plan.

In addition, the trial court failed to consider that a cause of action based in fraud may arise from *conduct* that is designed to mislead, and not only from verbal or written statements. (See *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567 ["A misrepresentation need not be oral; it may be implied by conduct."]; *Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 151 ["A misrepresentation need not be express but may be implied by or inferred from the circumstances."].) Hospital has alleged repeated engagement by Anthem concerning the treatment of Patient X, over a period of approximately 50 days, including the initiation of communications with Hospital staff and requests for information that would imply that the services authorized by Anthem and provided to Patient X by Hospital were not only medically necessary, but were *covered by Patient X's health insurance plan*. If the services were not covered, Anthem would have had no reason to continue to inquire about the medical necessity of the services and, in fact, according to the allegations of the complaint, the defendants would have been "legally barred from requesting information regarding the Patient for health care services that [were] not covered." Thus, to the extent that the trial court believed that Hospital had to allege that the defendants made an oral or written statement informing Hospital that the services in question were "covered" by Patient X's health insurance plan in order to sufficiently allege a cause of action for fraud, the trial court was in error.

24

Anthem suggests that Hospital's TAC is insufficient because it does not identify each individual and defendant entity who is alleged to have engaged in communications with Hospital regarding Patient X's care. To the extent that Hospital may be relying on the communications it received from *unnamed* case managers at Anthem, Hospital provided sufficient information to permit Anthem, the party with superior knowledge of who was responsible for preparing the documents in question, to identify the specific individual or individuals; Hospital is relieved from having to plead that particular information with specificity under such circumstances. (See *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 [plaintiff was not required to plead the identity of the preparer of a letter from "the Chase Fulfillment Center" because that information "was uniquely within Chase Bank's knowledge"]; see also *Committee on Children's Television, supra,* 35 Cal.3d at p. 217 [less specificity is required in pleading fraud when " 'it appears from the nature of the allegations that *the defendant* must necessarily possess full information concerning the facts of the controversy,' " italics added]; *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248 [" 'While the precise identities of the employees responsible . . . are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents.' "].)

For this same reason, we reject Anthem's contentions that the allegations are not sufficiently detailed as to which defendant entity employed "Aileen A." or any other individual identified in the complaint, or which defendant entity maintained each telephone number and fax number identified in the complaint. This information is

25

uniquely within the defendants' knowledge. Patient X's member identification card listed a single telephone number for care providers to contact for purposes of obtaining " 'Pre-Authorization' " for care. Hospital used the number that was provided on Patient X's card to seek authorization for his care. The defendants are the entities who decided what information to place on Patient X's member identification card. The defendants are also the ones who have decided which entity is responsible for the different tasks that are required to administer Eisenhower's health insurance plan. The mere fact that the nature of defendants' relationships with each other and each entity's particular role in conducting and administering the health insurance plan at issue are unclear, does not necessitate that a court permit them to escape any responsibility at the pleading stage of a lawsuit. Hospital has alleged a number of very specific facts that provide the defendant entities, who possess superior knowledge of the relationships between and among them, to be able to defend against the claims that Hospital asserts in its TAC. These specific factual allegations, including the times that various communications occurred and the telephone or fax numbers used, are also sufficient to demonstrate that there is a prima facie foundation for Hospital's allegation of fraud. (See *Committee on Children's Television*, *supra*, 35 Cal.3d at pp. 216-217.)

Anthem attempts to avoid the framing of the complaint by arguing that Hospital's allegations that "Anthem authorized particular services for the patient" do not constitute misrepresentations that the services would be covered, and not excluded. However, Anthem's position is based on its argument, both in the trial court and on appeal, that it

26

"provides no coverage for Eisenhower plan benefits,"[16] and that its "role was limited to providing 'utilization management' and administrative services."[17] However, according to the allegations of the TAC, Anthem, Eisenhower and Keenan had an agreement under which the Anthem entities and Keenan would act as Eisenhower's agents, performing all of the administrative services on behalf of Eisenhower's "Health Plan ERISA Trust," which "provides health care benefits for employees of Eisenhower Medical Center and their family members." These administrative services are alleged to include "*all communications and direct dealings with providers*, such as the Hospital, including but not limited to *verification of eligibility, benefits and authorization of services*; negotiating with providers, such as the Hospital, concerning any matters including the entering into and/or revisions to contracts; pricing claims in accordance with the terms of the plan documents and Summary Plan Description; producing member identification cards; conducting utilization review; *processing authorizations of services and responding to providers' requests for such authorizations*; and coordination and management of medical

---

16      This assertion is not supported by a citation to the record.

17      Notably, Anthem does not explain what other services it is referencing when it mentions "administrative services." In addition, Anthem spends three pages of its appellate brief describing the process of "[u]tilization management or utilization review"—which refers to "the process of determining whether services are medically necessary"—under the heading "Utilization Review by Anthem On Behalf Of The Health Plan." (Boldface omitted.) However, the question whether Anthem's role was or was not limited to "utilization review" is not a question that can be answered on demurrer, unless the allegations of the operative complaint or matters of which judicial notice may be taken establish such a fact. As we explain, the TAC does not allege that Anthem's role was so limited, and there are no facts as to which judicial notice has been taken. Anthem's discussion regarding this issue is therefore wholly irrelevant.

care through case management." (Italics added.) Thus, the TAC alleges that Anthem's role was, essentially, to administer Eisenhower's health plan on behalf of Eisenhower— i.e., Anthem was to act as Eisenhower's agent in implementing all aspects of the health plan, and to be the *sole* contact for entities such as Hospital. In addition, the TAC alleges that Patient X's member identification card identified one of the Anthem entities, BC Life, and Keenan, as Eisenhower's "authorized agent and administrator of Eisenhower's plan." The card further identified another Anthem entity, Blue Cross, as the agent and administrator for Eisenhower and BC Life who "administers *claims*" under Patient X's plan. (Italics added.)

Beyond these allegations, the TAC alleges that "there has existed a trade custom and usage that, to the extent that a health plan and its administrators have information indicating that services are not covered under the plan, the health plan and its administrators do not authorize such services." Thus, "there has existed a trade custom and usage that *an authorization of services constitutes an affirmative representation that*, based on all of the information the health plan has been provided to date, *the services are covered*."[18] (Italics added.)

Anthem's assertions as to the limitations of Anthem's role in administering Eisenhower's health plan may or may not be true. However, these are factual questions

---

[18]    The TAC further alleges that this "custom and usage is, and at all times mentioned has been, certain and uniform, of general continuity and notoriety, and acquiesced-in by the whole of this industry," and, beyond this, "was well known to the Hospital and to Blue Cross, BC Life, Anthem UM, Eisenhower, Keenan, and Does 1 through 25 at the time of their communication of each of the authorizations."

that cannot be determined on a demurrer to a pleading that contains allegations that conflict with Anthem's assertions in briefing in this court. Further, Anthem's attempts to rely on *evidence* that it contends contradicts the allegations of the operative complaint (i.e., the contents of letters that we have determined are not the proper subject of judicial notice) is improper at this procedural juncture. Again, this matter was decided on a demurrer, which exists as a procedural mechanism to determine whether, *if the allegations of the operative complaint are presumed to be true*, the plaintiff has sufficiently stated a cause of action. It is not the appropriate procedural vehicle to argue the merits of the plaintiff's allegations.

Anthem's attempt to rely on *Tenet Healthsystem Desert, Inc. v. Fortis, Ins. Co.* (C.D.Cal. 2007) 520 F.Supp.2d 1184, 1192-1195 to argue that Hospital's allegations regarding trade usage, custom, and course of dealing should be ignored, is misplaced. If anything, *Tenet* supports this court's conclusion that this case was not appropriately decided on demurrer. In *Tenet*, the federal court was considering a *motion for summary judgment*; as a result, the district court's decision in *Tenet* was decided based on uncontroverted *evidence* that had been presented to the trial court, including declarations from representatives of both the plaintiff and defendant about the communications between them regarding the patient's care, an admission by the plaintiff that it "knew of no false, misleading, or untrue statements made by Defendant in connection with the calls or at any other time" and that "Defendant did not fail to provide it with any information" (*id.* at p. 1191), as well as "expert testimony regarding industry custom" (*id.* at p. 1192, capitalization and boldface omitted), involving "emergency room admissions." (*Id.* at

p. 1193.) The conclusions reached by the trial court in *Tenet* on a motion for summary judgment are simply of no assistance to Anthem with respect to the questions raised by its demurrer to Hospital's complaint.

The TAC also sufficiently alleges facts to support the elements of defendants' knowledge of the falsity of the alleged misrepresentations, their intent to induce Hospital's reliance, as well as Hospital's justifiable reliance on the alleged misrepresentations. The TAC alleges that knowledge of the plan's coverage, including the exclusions, was, as between the parties, exclusively in the defendants' possession, and that Hospital informed Anthem that Patient X was admitted to Hospital as a result of being "injured while driving in an automobile accident with a blood alcohol level in excess of the legal limit and positive for cannabis." The TAC alleges that Anthem knew this information because Hospital provided it to Anthem on May 7, 2012, and that Anthem continued to monitor, discuss, and authorize Patient X's treatment at Hospital on multiple occasions after having been informed about his blood alcohol level and positive test for cannabis. In addition, the TAC alleges that Anthem knew of the coverage exclusions. As a result, any representations Anthem made that indicated to Hospital that the services Hospital was providing to Patient X would be covered are alleged to have been made with the knowledge that those representations were false.

In addition, the TAC alleges that the defendants made misrepresentations to Hospital that the services "were authorized and covered with the intent to induce the Hospital to act in reliance on them . . . or with the expectation that the Hospital would so act." Further, the TAC includes allegations that Hospital "was ignorant of the falsity of

30

the representations [made by the defendants] and believed them to be true," and that Hospital acted in reliance on the representations when it, for example, admitted Patient X to its acute rehabilitation facility. The TAC also alleges that Hospital refrained from seeking reimbursement from Medi-Cal for services provided to Patient X within Medi-Cal's time limits because, as a result of the representations made by Anthem, Hospital believed that the defendants would pay Hospital for the services provided. These allegations sufficiently allege justifiable reliance.

In sum, the TAC provides a detailed set of allegations of fraud against Anthem. Given the specificity of these numerous alleged communications, and given the allegation that the provision of an "authorization" has a specific meaning in this context, i.e., that an "authorization of services constitutes an affirmative representation that . . . the services are covered," Hospital has sufficiently alleged the existence of multiple affirmative misrepresentations that Patient X's care would be covered by his insurance plan.

3. *Fraud based on suppression of facts (causes of action 2 and 11)*

For similar reasons we conclude that the trial court erred in sustaining defendants' demurrer to the TAC's causes of action for fraud based on the intentional suppression of material facts. The tort of concealment is simply another species of fraud or deceit. (See Civ. Code, § 1710, subd. (3) [fraud includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"]; *Lovejoy v. AT&T Corp.* (2004) 119 Cal.App.4th 151, 158.) "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant

31

must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Marketing West, Inc. v. Sanyo Fisher* (*USA*) *Corp.* (1992) 6 Cal.App.4th 603, 612-613 (*Marketing West*).) Thus, the elements of fraud and deceit based on concealment are the same as for intentional fraud, with the additional requirement that the plaintiff allege that the defendant concealed or suppressed a material fact in a situation in which the defendant was under a duty to disclose that material fact.

" 'In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; [or] (3) the defendant actively conceals discovery from the plaintiff.' (Fns. omitted.)" (*Marketing West*, *supra*, 6 Cal.App.4th at p. 613, quoting *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294.)

Although Hospital has not alleged the existence of a fiduciary or confidential relationship, the allegations do set forth facts demonstrating that Anthem made representations to Hospital but failed to disclose facts that rendered misleading the disclosures that Anthem did make. Again, Hospital alleged that over a period of almost

32

two months, representatives of Anthem repeatedly "authorized" the medical services that Hospital provided to Patient X, despite possessing knowledge that his care would not be covered by the insurance policy because his injuries were sustained as a result of his driving with a blood alcohol level in excess of the legal limit. Even if Hospital had not alleged that by "authorizing" services defendants were also representing that the services would be "covered" or paid for by insurance, Hospital sufficiently alleged that Anthem's statements to Hospital concerning the authorization of services and Anthem's requests for information, to which it would not be entitled if the services were not covered by insurance, were misleading. In the absence of facts disclosing the exclusion from coverage for Patient X's injuries, the nature and number of Anthem's communications with Hospital over approximately 50 days would cause a reasonable person to believe that the services would be paid for by Patient X's insurer.

        4.     *Negligent misrepresentation (causes of action 1 and 10)*

The tort of negligent misrepresentation is similar to fraud, except that it does not require scienter or an intent to defraud. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 487-488.) Because the same elements of intentional fraud also comprise a cause of action for negligent misrepresentation, with the exception that there is no requirement of intent to induce reliance (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173), Hospital's complaint, which we have already determined sufficiently pleads the elements of intentional fraud, also necessarily sufficiently pleads the elements of Hospital's alternative claim that if intentional fraud cannot be established, then the facts are sufficient to establish the existence of a cause of action for negligent misrepresentation.

33

We therefore conclude that the trial court erred in sustaining the demurrer with respect to causes of action 1 and 10.

5.    *Unfair business practices (cause of action 19)*

Our conclusion that the trial court erred in sustaining the demurrer to Hospital's first, second, third, tenth, eleventh, and twelve causes of action has the further effect of reviving Hospital's nineteenth cause of action, which sets forth a claim for unfair business practices pursuant to Business and Professions Code section 17200.  An unfair business practice includes " ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' "  (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383.)

Hospital's cause of action for unfair business practices is based on a variety of alleged conduct, including that defendants "engaged in misrepresentation [and] fraud" in their business practices with Hospital based on the same conduct underlying the other deceit-based causes of action.  We therefore conclude that Hospital has sufficiently alleged facts to state a claim for unfair business practices pursuant to Business and Professions Code section 17200.

IV

DISPOSITION

The judgment of the trial court in favor of Anthem on causes of action 1, 2, 3, 10, 11, 12 and 19 is reversed and the matter is remanded.  Hospital is entitled to costs on appeal.


AARON, J.

WE CONCUR:


NARES, Acting P. J.


IRION, J.