Filed 6/24/21  Theodore v. Danning, Gill, Diamond & Kollitz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MICHAEL THEODORE, | B291700 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC680011) |
| DANNING, GILL, DIAMOND & KOLLITZ, et al. | |
| Defendants and Respondents. | |

———————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory W. Alarcon, Judge.  Affirmed.

Steven Zelig, WLA Legal Services, Inc. for Plaintiff and Appellant.

Law Offices of Thomas J. Weiss and Thomas J. Weiss; Lyle Mink for Defendants and Respondents.

———————————

## INTRODUCTION

Kyle Madison, his former wife Marjan Madison,[1] and Michael Theodore formed a limited liability company to operate a rental property in Mexico. After financial disputes arose, Kyle filed an action against Theodore alleging breach of fiduciary duty and fraud, among other claims. The trial court appointed a referee pursuant to Code of Civil Procedure section 639[2] to conduct an accounting and a liquidator pursuant to the Corporations Code to wind up the company's affairs. After several years of hard-fought litigation, Theodore filed this action against the Madisons, their counsel, the referee, the liquidator, and the liquidator's counsel alleging they wrongfully excluded Theodore's counsel from their communications during the prosecution of Kyle's action and unlawfully "teamed up" against Theodore.

The referee, the Madisons, and the Madisons' counsel filed special motions to strike under Code of Civil Procedure section 425.16. Ruling that the referee's and the Madisons' communications and litigation conduct were protected activities and that Theodore failed to demonstrate a probability of prevailing on his claims, the trial court granted the motions. Theodore argues that, because the referee and the Madisons engaged in "criminal misconduct," section 425.16 does not apply. According to Theodore, even if the activities of the referee and the Madisons were protected under section 425.16, he made a

---

[1]     We refer to the Madisons by their first names and collectively as the "Madisons."

[2]     Undesignated statutory references are to the Code of Civil Procedure.

2

sufficient prima facie showing of merit. Theodore also argues that the litigation privilege is not a bar to his claims because it does not apply to criminal misconduct, noncommunicative conduct, or conspiracy and aiding and abetting. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. *The Dissolution Action*

#### 1. *Casa W, LLC*

In 2005, Kyle, who is an attorney, Marjan, and Theodore purchased a house in Cabo San Lucas, Mexico and formed a limited liability company, Casa W, LLC (Casa W), to operate the property as a rental business. Theodore was the managing member of Casa W. Theodore owned another limited liability company, Casa Theodore, LLC, that owned the adjacent property known as Casa Theodore. Theodore was the only member of Casa Theodore, LLC.

#### 2. *Complaint and Cross-complaint*

After the parties could not resolve disputes regarding Casa W's finances, on April 15, 2011, by his counsel Lyle R. Mink, Kyle filed an action against Theodore and Casa W alleging eight causes of action for breach of the contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, fraud, dissolution of Casa W, appointment of receiver, an accounting, and preliminary and permanent injunctions in aid of receiver.[3] Kyle alleged that Theodore had engaged in "abuse of authority, self-dealing and pervasive fraud" as the managing member of Casa W. Kyle alleged that, despite repeated requests over the

---

[3]   At Kyle's request, the trial court later added Marjan as a plaintiff.

years, Theodore never provided any records of rental income, expenses, and other costs for Casa W. Nor, Kyle alleged, did Theodore furnish any records documenting his disbursements, expenditures, and loans on behalf of Casa W. On April 13, 2012, by their counsel, Daniel J. Spielfogel, Theodore and Casa W filed a cross-complaint against the Madisons alleging five causes of action for declaratory relief, breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and fraud. On January 24, 2013, the trial court[4] appointed Pamela Wax-Semus, a certified fraud examiner, as an expert under Evidence Code section 730 to analyze the financial transactions of Casa W and Casa Theodore, LLC.

3. *Trial*

After approximately 15 days of trial, in an October 22, 2015 statement of decision, the trial court[5] ruled that Theodore breached his fiduciary duties to the Madisons because "he cut the Madisons out of the operation of the business with no authority to do so and did not share the profits with them, thus, acting against the interests of the Madisons." The trial court further ruled, "[G]iven that it was and is not possible for the members of [Casa W] (vs. Theodore alone) to carry out the business of [Casa W] according to the terms of the Operating Agreement because [Theodore] has essentially shut out the Madisons, [Casa W] must be dissolved." The trial court found, "Wax-Semus' work exceedingly credible, reliable, and instructive." The trial court added, "[Wax-Semus] performed an unbelievable amount of work [in] this case. In fact, she was the only expert in this case that

---

[4]     Judge Frederick C. Shaller

[5]     Judge Samantha P. Jessner

4

performed the item-by-item analysis that [the trial court] anticipated. As a result, the parties' experts . . . relied heavily on the work that she performed." The trial court further found, "Wax-Semus did exactly what a certified fraud examiner is supposed to do—she followed the evidence in order to arrive at her conclusions."

### 4. *Referee and Liquidator*

By order dated March 4, 2016, in accordance with section 639, subdivision (a)(2), the trial court appointed Wax-Semus as a referee to conduct an accounting. The trial court ordered Wax-Semus to "prepare a detailed accounting of all receipts and disbursements, which includes an analysis of source documents (e.g., bank statements and canceled checks) and a detailed analysis of the financial accounting records of [Casa W], including but not limited to general ledgers, cash receipts journals, disbursement journals, and general/adjustment journal[s] from January 1, 2005 to date." The trial court ordered Casa W to pay for Wax-Semus's services. The trial court further ordered, "If there are insufficient funds in the [Casa W] bank account to pay her bill, the parties may seek a further order of court to decide the appropriate course of action at that time."

In another order dated March 4, 2016,[6] the trial court dissolved Casa W effective October 22, 2015 pursuant to Corporations Code section 17707.03, subdivisions (a) and (b). The trial court appointed Richard C. Diamond the "Court-Appointed

_____

[6] We take judicial notice of this order, the orders dated August 1, 2016, August 16, 2016, August 22, 2016, and December 13, 2017, and the judgment entered on January 22, 2021. (See Evid. Code, § 451, subd. (a).)

5

Liquidator of [Casa W]" to "wind up" Casa W's affairs. The order provided, "Diamond has the authority to take or not take any action incident to dissolution, including without limitation the authority to bind [Casa W] to new or additional liabilities. Diamond may sell, transfer, pledge, or otherwise dispose of [Casa W's] assets on such terms and for such consideration as he, in his sole discretion, deems reasonable, accept as payment for the assets either cash or obligations of the purchaser, pay all debts and obligations of [Casa W], and generally take or not take such actions as may be necessary and reasonable to completely wind up the business of [Casa W]." The order further stated, "Diamond shall have the sole authority to employ and discharge persons whose services for or on behalf of [Casa W] may or may not be reasonably necessary in connection with the winding up process, including but not limited to attorneys, accountants, brokers, and other professionals." The order also provided, "Under Corporations Code section 17707.04(c), Diamond shall be entitled to reasonable compensation from [Casa W] to wind up the affairs of the [Casa W]." The order stated, "If there are insufficient funds in [Casa W] bank account(s) to pay expenses associated with the winding up process, including but not limited to costs associated with the sale of [the rental property], the parties may seek a further order of court to decide the appropriate course of action at that time."

In March 2016, Diamond hired his law firm, Danning, Gill, Diamond & Kollitz, LLP (Danning Gill), to act as the liquidator's general counsel. On August 1, 2016, the trial court ordered Theodore to pay $166,211.87 to Diamond. The trial court also ordered the Madisons and Theodore to "each pay one-half of all of the bills of Ms. Pamela Wax-Semus."

6

### 5. *The Conversion Action*

On July 13, 2016, Mink filed on behalf of the Madisons an action in the Los Angeles Superior Court against Theodore's counsel, Spielfogel, and Theodore's accounting expert, Thomas E. Pastore. Based on allegations that Theodore paid Spielfogel and Pastore "monies from bank accounts that contained the undistributed [Casa W] funds due the Madisons" and that Spielfogel and Pastore "wrongly assumed control" over the funds and "applied them" to their own personal use, the complaint asserted causes of action for conversion. The Madisons attached payment schedules prepared by Wax-Semus to their complaint

### 6. *Disqualification of Referee*

On February 14, 2017, based on Wax-Semus's "legion of unauthorized ex parte communications" with Kyle, Mink, and Diamond, Theodore filed a motion to disqualify Wax-Semus, vacate the court's October 22, 2015 statement of decision, require Wax-Semus to return to Theodore all fees he paid to Wax-Semus, and enter terminating sanctions against the Madisons. On March 24, 2017, after finding that "Wax Semus had a duty to avoid *ex parte* communications and promptly notify parties of the substance of *ex parte* communications to provide the parties with an opportunity to respond," the trial court disqualified Wax-Semus as a referee.

The trial court found that "there is overwhelming evidence that Wax Semus has consistently violated her duty to refrain from engaging in *ex parte* communications in her capacity as a referee in this action." The trial court explained, "Wax-Semus has been exposed to a barrage of disparaging comments from attorney Mink toward both Defendant Theodore and his counsel. For example, Mink called Theodore 'dishonest' prior to phase one

7

of trial in this matter . . . and a 'thief' who Mink guesses has 'already cheated the IRS out of plenty' on May 12, 2016. . . . Wax Semus failed to notify defense counsel of these disparaging comments and personal attacks.  [¶]  Additionally, on May 13, 2016, the date of a Final Status Conference in this action, Wax Semus provided [Diamond] with information regarding why he 'and Mr. Theodore have different income numbers for 2015.' While Wax Semus copied Mink on the email, she failed to copy [Theodore's] counsel.  As if that wasn't bad enough, she ended the email as follows:  'I hope this helps.  Good luck.' . . . Additionally, in complete disregard of duties, on July 5, 2016, Wax Semus provided 'schedules/documents you may be able to use at the hearing on Thursday' to Mink and [Diamond]. . . . Again, [Theodore and Casa W] were not copied on this communication." The trial court further found, "By far the most troubling conduct by Wax Semus occurred on June 9, 2016 when she provided a separate report to Mink at his sole request that later formed the basis for a lawsuit Madison filed against Spielfogel and [Theodore's] forensic accountant, Pastore."

In rejecting Theodore's request to vacate the October 22, 2015 statement of decision, the trial court found: "Each of the e-mails that [Theodore] claims show that Wax-Semus was biased, engaging in unauthorized ex parte communications and lacking in credibility were admitted in the phase one trial and considered by the court."  The trial court ruled, "[Theodore] was given a full opportunity to present evidence of the potential bias of Wax-Semus, Wax-Semus's report, and her conclusions in the first phase of trial. . . . [W]hile there is direct evidence of attorney Mink disparaging Defendant Theodore and his attorney to Wax-Semus prior to phase one of

8

trial, there is no evidence that Wax-Semus entertained that same bias or adopted Mink's unprofessional opinion of Theodore and Spielfogel." Therefore, the court found that Theodore's "due process rights were adequately protected" at trial. The trial court added that Theodore's "attempts to get out from under an adverse ruling are disingenuous and transparent."

The trial court also denied Theodore's request that Wax-Semus return all funds paid by Theodore because "Theodore's arguments are properly considered at the conclusion of this action (assuming there is a conclusion) pursuant to Evid. Code § 731." As to Wax-Semus's invoices for her services as a referee, the trial court found, "[I]t was not clear that Theodore has paid any of her bills since she was appointed as referee (especially given that he rarely seems to pay anyone's bills even when faced with the prospect of imprisonment)." After finding the conduct of Kyle and Mink "deeply troubling," the trial court commented, "As to the *ex parte* communications that are before the court, it is difficult to ignore the extent to which Mink and Mr. Madison treated Wax Semus essentially as a member of their litigation team, the most obvious example being their request that she prepare a schedule enabling them to sue Spielfogel and Pastore in a separate action."

7. *Trial Court Recusal and Discharge of Liquidator*

On March 27, 2017, "upon reflection," the trial court[7] recused itself, explaining "that further proceedings in this case should proceed before another judicial officer unencumbered" by the opinions formed from "the nature and extent of ex parte communications that plaintiff Kyle Madison and his attorney,

---

[7]     Judge Samantha P. Jessner

9

Lyle Mink, had with Pamela Wax-Semus after the court appointed her as a referee in this case." Because of the recusal, by order dated August 16, 2017, the trial court[8] declared a mistrial because the same judge was not available to complete the trial. On August 22, 2017, "in furtherance of this Court having declared a mistrial in this action," the trial court entered an order discharging Diamond.

On December 13, 2017, the trial court entered an order approving "on a final basis" $918,009.77 in fees and costs for Diamond and Danning Gill. After deducting prior payments, the December 13, 2017 order required Casa W, the Madisons, and Theodore to jointly and severally pay Diamond and Danning Gill $797,879.95. The trial court retained "jurisdiction over any disputes or other matter involving" Diamond and any professionals he retained. The order provided it was "enforceable as a money judgment" in favor of Diamond and against Casa W, Theodore, and the Madisons.

After a retrial, on January 22, 2021, the trial court entered a judgment of $3,928,300 against Theodore and in favor of the Madisons. The judgment provided that the Madisons' attorney fees would be determined by separate motion.

B. *This Action*

On October 13, 2017, Theodore filed this action in the Los Angeles Superior Court against the Madisons, Mink,[9] Wax-Semus, Diamond, and Danning Gill (defendants).

---

[8]    Judge Gregory W. Alarcon

[9]    Theodore also named Lyle R. Mink, A Law Corporation.

### 1. *Communications with Fraud Examiner/Referee*

In a 160-page first amended complaint filed on January 18, 2018, Theodore alleged that, before the court appointed Wax-Semus as an Evidence Code section 730 expert, Wax-Semus represented that she "would and could be fair, impartial and would conduct [herself] in accordance with the rules and bylaws of the 'Association of Certified Fraud Examiner.'" However, according to Theodore, Wax-Semus later "conceded that she had no intent of complying with this promise" and "severely violated virtually every standard of the Association of Certified Fraud Examiners." Theodore further alleged that the Madisons and Mink "aided, abetted and encouraged" Wax-Semus "in defrauding and breaching fiduciary duties owed" to Theodore "by engaging in a large number of ex parte communications of both a substantive and strategic nature" with Wax-Semus.

Based on the "rampant" and "pervasive" ex parte communications among Wax-Semus, Kyle, and Mink, Wax-Semus "covertly stepped out of her role as neutral and impartial court appointed expert, and into the role as advocate and expert witness for the [Madisons] and [Mink] and charged [Theodore] for her time helping the [Madisons] and [Mink], and otherwise acting as part of their litigation team." Theodore alleged that Wax-Semus's "inappropriate and illegal conduct included litigation strategies and approaches to be used by the [Madisons] and [Mink] against [Theodore] and doing so without alerting [Theodore]." Theodore further alleged that Wax-Semus "[f]alsely billed" Theodore for services that were "provided" to the Madisons and Mink and that Wax-Semus procured "substantial amounts of funds from [Theodore] under the false and fraudulent pretense that she was acting as [a] neutral and impartial arm of

11

the court." Theodore alleged that Wax-Semus "procured under false pretenses" $124,000 in payments from Theodore.

Theodore further alleged that, as a direct result of Wax-Semus's "skewed and corrupt testimony," in March 2016 the trial court "expanded" the role of Wax-Semus by appointing her as a "referee." Because this appointment "[w]as an arm of the court, it was even more important that Wax-Semus comply with ethical standards imposed on a judge . . . to avoid ex parte communications at all costs." Theodore also alleged that, after her appointment as a referee in March 2016, Wax-Semus "continued to engage in illegal *ex parte* communications of a strategic and substantive nature with" Mink, Kyle, Diamond, and Danning Gill.

Theodore further alleged that, "in an unprecedented example of malice," based on accounting schedules that Wax-Semus prepared, on July 13, 2016, Mink filed on behalf of the Madisons an action in the Los Angeles Superior Court against Spielfogel and Pastore. Mink and the Madisons "filed the suit to interfere with Spielfogel's representation of [Theodore], and to upset Pastore so that he would bow out as [Theodore's] forensic expert." According to Theodore, the Madisons and Mink "falsely and without any basis" alleged that "Pastore and Spielfogel had engaged in conversion, and had engaged in acts justifying punitive damages per Civil Code section 3294." Theodore alleged that, although Theodore "paid in substantial part for the time [Wax-Semus] spent in creating the schedules used against [him]," Theodore "never authorized" Wax-Semus "to generate these schedules."

12

### 2. *Communications with Liquidator and His Counsel*

Theodore also alleged that, "as a direct result of the corrupt testimony of [Wax-Semus], the trial court appointed Diamond" to liquidate Casa W. Theodore alleged that Diamond "had no intent of properly managing [Casa W]," that Diamond's "'intent [was] to immediately hire a lawyer associated with [Danning Gill] in order to inflate billing," and that Diamond's intent was to follow his and Danning Gill's "established business practice" to "generate bills that were as high as possible." Theodore alleged that, Diamond and Danning Gill, like Wax-Semus, "illegally 'team[ed]' up" with the Madisons and Mink and "engage[d] in illicit ex parte communications." Theodore alleged that between March 4, 2016 and August 1, 2016 Diamond "engaged in more than 270 ex parte communications" with the Madisons and Mink. Before presenting a "sampling" of the ex parte communications involving Diamond, the first amended complaint described "four categories of illicit ex parte communications: (1) Ex parte communications sent to [Diamond and Danning Gill] in which Mink severely disparages Theodore and Spielfogel; (2) Ex parte communications in which Kyle and Mink direct and instruct Diamond and Wax-Semus as to how to conduct themselves, and dispatch Diamond as the investigative envoy of the Madisons and Mink; (3) Ex parte communications where Mink strategized with Diamond in favor of the Madisons and against Theodore, and, (4) Miscellaneous ex parte communications."

For example, the complaint quoted emails from Mink to Diamond in which Mink stated that Theodore "does not tell the truth," that he "bribes people," and that he was "deceitful." The first amended complaint further alleged that in ex parte communications Mink told Diamond that Diamond "needs to take

13

over the property immediately," that "you need to be more decisive about such things," and that "as to the discrepancy (Diamond) found in the rents . . . I'm going in next week for an OSC re contempt against Theodore." Theodore further alleged that Kyle sent a "very lengthy e-mail to [Diamond], in which [Kyle] instructed [Diamond] to investigate at least 15 different issues when he was in Cabo." In furtherance of the "fraudulent and illegal scheme," Theodore alleged that Diamond and Danning Gill submitted "fraudulent, excessive, and exaggerated" bills for their services to Theodore.

### 3. *23 Causes of Action*

In the first amended complaint, based on the communications among the defendants, Theodore asserted a first cause of action for "fraud in the inducement and performance" against Wax-Semus and the Madisons and Mink "who aided and abetted and conspired with [Wax-Semus]"; a second cause of action for "negligent misrepresentation" against Wax-Semus; a third cause of action for breach of fiduciary duty against Wax-Semus and the Madisons and Mink "who aided and abetted [Wax-Semus]"; a fourth cause of action for "constructive fraud" against Wax-Semus and the Madisons and Mink "who aided and abetted and conspired with [Wax-Semus]"; a fifth cause of action for "statutory violations" (Pen. Code, §§ 484, 496) against Wax-Semus and the Madisons and Mink "who aided and abetted and conspired with [Wax-Semus]"; a sixth cause of action for negligence against Wax-Semus; a seventh cause of action for breach of contract against Wax-Semus; an eighth cause of action for "intentional interference with contract" against Wax-Semus as to Theodore's contract with the Madisons; a ninth cause of action for "breach of fiduciary duty" against Diamond and

14

Danning Gill "aided and abetted by and in conspiracy with" the Madisons and Mink; a tenth cause of action for "constructive fraud" against Diamond and Danning Gill "aided and abetted by and in conspiracy with" the Madisons and Mink; an eleventh cause of action for "statutory violations" (Pen. Code §§ 484, 496) against Diamond and Danning Gill "aided and abetted by and in conspiracy with" the Madisons and Mink; a twelfth cause of action for "conversion" against Diamond and Danning Gill; a thirteenth cause of action for "negligence" against Diamond and Danning Gill; a fourteenth cause of action for "breach of contract" against Diamond and Danning Gill; a fifteenth cause of action for "intentional interference with contract" against Danning Gill; a sixteenth cause of action for "breach of fiduciary duty" against the Madisons "aided and abetted by and in conspiracy with" Wax-Semus, Diamond, Danning Gill, and Mink; a seventeenth cause of action for "constructive fraud" against the Madisons "aided and abetted by and in conspiracy with" Wax-Semus, Diamond, Danning Gill, and Mink; an eighteenth cause of action for "breach of contract" against the Madisons; a nineteenth cause of action for "interference with contract" against the Madisons and Mink; a twentieth cause of action for "wrongful appointment and manipulation of liquidator" against the Madisons; a twenty-first cause of action for "defamation/false light" against the Madisons; a twenty-second cause of action for "fraud" against Diamond, Danning Gill, Mink, and the Madisons; and a twenty-third cause of action for "statutory violation (civil RICO)" against Diamond and Danning Gill "aided and abetted by and in conspiracy with" Mink and the Madisons. The twenty-third cause of action was for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO; 18 U.S.C. § 1961 et seq.)

15

C. *Special Motions To Strike*

    1. *Mink*

Mink argued that the 12 causes of action alleged against him "arise from and directly relate to [Mink's] actions and communications in his capacity as attorney for the plaintiffs" in the dissolution and conversion actions. Accordingly, "each such cause of action is based on conduct described in section 425.16" because "[s]tatements made in litigation, are protected activity." Citing *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*), Mink further argued "that [Theodore] cannot contend that mere assertions and allegations that communications are criminal removes them from qualifying as protected activity under the anti-SLAPP statute." According to Mink, "the question of whether litigation communications are criminal arises only when the court turns to step 2, and inquires whether the claims based on protected conduct are supported by evidence sufficient to establish criminality."

Relying on *Bergstein v. Strook & Strook & Lavan LLP* (2015) 236 Cal.App.4th 793 (*Bergstein*), Mink argued, "[Theodore] cannot show probability of success on any of his claims because of the scope of the litigation privilege under section 47 of the Civil Code. That privilege is absolute, except for malicious prosecution claims, which are not and cannot be part of the complaint herein." Concerning Theodore's RICO cause of action, Mink argued that it was not only "based on the same litigation-related communications which are the basis of the other claims," but also that Theodore failed to allege the required predicate acts and the pattern of racketeering activity.

16

### 2. *The Madisons*

In the Madisons' special motion to strike the 15 causes of action asserted against them, the Madisons repeated Mink's arguments that "[s]tatements made in litigation or in connection with litigation, are protected activity," that Theodore "cannot contend that mere assertions and allegations that communications are criminal removes them from qualifying as protected activity," and that Theodore "cannot show a probability of success on any of his claims because of the scope of the litigation privilege under section 47 of the Civil Code." The Madisons added, "All of the causes of action against the [Madisons] arise from and directly relate to [Kyle's] actions and communications in his capacity as attorney for the plaintiffs in the [dissolution and conversion actions]. . . . With respect to [Marjan], the 'theory' of her liability is entirely one of vicarious liability for the litigation-related communications of Mink and [Kyle]."

### 3. *Wax-Semus*

To strike the 11 causes of action asserted against her, Wax-Semus argued, "All of the factual allegations in [Theodore's] complaint describe Ms. Wax-Semus acting in her capacity as either the court-appointed Evidence Code § 730 expert, or as the court-appointed Code of Civil Procedure § 639(a)(2) referee. There are no factual allegations plead against Ms. Wax-Semus other than in those two capacities." Because her "alleged conduct consists of statements or actions in connection with a judicial proceeding[ ], or in connection with an issue under consideration or review by a judicial proceeding[ ]," Wax-Semus maintained that she established protected activity under section 425.16, subdivision (e)(1) and (2).

Wax-Semus further argued the "litigation privilege is a substantive defense that [Theodore] simply cannot overcome" because Theodore's claims "arise from the discharge of her duties as the court-appointed expert under Evidence Code § 730," "[e]ach and every communication complained of by [Theodore] was made in the course of [the dissolution action], a judicial proceeding," and the "communications were allegedly made to further the [Madisons's] goals and objectives in [the dissolution action]." Wax-Semus also argued that Theodore's claims were barred because she "enjoy[ed] quasi-judicial immunity as both the court-appointed referee under Code of Civil Procedure § 639(a)(2) and as the court-appointed expert under Evidence Code § 730." Finally, Wax-Semus stated in a declaration, "I have had no dealings with Plaintiff Michael Theodore whatsoever in any capacity other than as the court-appointed expert witness under Evidence Code § 730 and other than as the court-appointed referee under Code of Civil Procedure § 639(a)(2) in [the dissolution action]."

### 4. *Theodore's Oppositions*
#### a. *Wax-Semus*

In opposition to Wax-Semus's special motion to strike, Theodore argued that "the court cannot grant the anti-SLAPP motion as to any cause of action" because "each cause of action asserted against Wax-Semus contains provable allegations that Wax-Semus engaged in criminal misconduct." According to Theodore, he did not "have to get to the merits of [his] causes of action" because, under *Flatley, supra,* 39 Cal.4th 299, "if illegality is demonstrated . . . then the anti-SLAPP statute is not available to the defendant." Theodore contended, "Wax-Semus's conduct and procurement of substantial funds from Theodore under false

18

and fraudulent pretenses, constituted a criminal offense per [Penal Code] sections 484 and 496 and hence is not subject to the litigation privilege or to protection under section 425.16."

Theodore further argued, "[I]t is clear that Wax-Semus severely violated her duties as an officer of the court and engaged in a conspiracy with the Madisons, Mink, and Diamond, resulting in a very significant damage to Theodore." Theodore added that "engaging in conspiracy is an independent, non-communicative act which is not subject to the litigation privilege." Theodore also argued that the "wrongful taking of money is not protected activity. Since this is central to [Theodore's] claim against Wax-Semus, the court must deny this motion." Because "Wax-Semus stepped out of her proper role as an independent expert, and into the role of being part of Madisons's litigation team," Theodore argued Wax-Semus "cannot rely on quasi-judicial immunity." Without specifying the evidence that supported the elements of the causes of action asserted against Wax-Semus or citing legal authorities that established the legal sufficiency of these causes of action, Theodore concluded that he demonstrated "his prima facie case as to [the] causes of action asserted against Wax-Semus."

b. *Mink*

Theodore also argued that "every cause of action asserted against Mink includes provable allegations of criminal conduct, . . . accordingly the court cannot grant this motion as to any cause of action." Theodore further argued, "Section 6128 of the [Business and Professions] Code makes it a misdemeanor for Mink to engage in any deceit or collusion with the intent to deceive the court or a party. Here, Mink severely disparaged Theodore, calling him every 'name in the book,' and accusing him

19

in so many different ways of being a criminal." Theodore continued, "Especially in light of the very high volume of emails, a reasonable trier of fact could conclude that this constituted collusive and deceitful conduct designed to deceive a person and the court." Theodore maintained that "Mink's conduct in aiding and abetting both Wax-Semus and Diamond in procuring substantial funds from Theodore under false and fraudulent pretenses, constituted a criminal offense per [Penal Code] Sections 484 and 496 and hence is not subject to the litigation privilege or to protection under section 425.16." According to Theodore, "[B]ecause section 425.16 does not apply to criminal misconduct, the court does not even have to go to the second step of the analysis."

Theodore also argued that the litigation privilege did not apply because "Mink's conduct and communication was not designed to achieve the legitimate objects of the litigation." In summary fashion without identifying evidence in relation to the elements of the causes of action or establishing the legal sufficiency of the causes of action, Theodore concluded that he demonstrated "his prima facie case" as to the causes of action asserted against Mink. For example, regarding the tenth cause of action against Mink for aiding and abetting Diamond's and Danning Gill's "constructive fraud," Theodore asserted, "[T]here is a mountain of evidence by which the trier of fact can conclude that Mink aided and abetted constructive fraud by Diamond."

c. *The Madisons*

After pointing out the "acts and omissions of Mink . . . are imputable to the Madisons," Theodore argued, "Kyle himself personally engaged in many direct communications with Wax-Semus/Diamond, issued directive[s] to them and was effectively

20

copied on all emails between Mink, Wax-Semus, Diamond and [Danning Gill]." Theodore added that "engaging in conspiracy is an independent, non-communicative act which is not subject to the litigation privilege." Theodore then repeated his argument that because "every cause of action asserted against the Madisons . . . includes provable allegations of criminal conduct," the "court cannot grant this motion as to any cause of action." Theodore further argued that, based on the "severe nature of the highly disparaging comments Kyle and Mink made about Theodore in emails," Theodore has a probability of prevailing on all causes of action. Theodore repeated his conclusory arguments that he demonstrated "his prima facie case" as to all causes of action asserted against the Madisons. Theodore did not identify the evidence that supported the elements of the causes of action or established their legal sufficiency.

### d. *Spielfogel Declaration*

In support of Theodore's oppositions to the three special motions to strike, Spielfogel filed a 123-page declaration. In his declaration, Spielfogel summarized and quoted from the "pervasive ex parte communications" among Kyle, Mink, and Wax-Semus. According to Spielfogel, he attached to his declaration "true and correct copies of: (1) examples of emails and other documentation evidencing unethical and inappropriate ex parte communications of a substantive nature of which I was not informed; (2) examples of numerous instances where Mr. Mink, Mr. Madison and Ms. Wax-Semus made inappropriate and prejudicial comments about Mr. Theodore of which I was not informed and not given the opportunity to rebut; (3) examples of numerous instances where Ms. Wax-Semus assisted Mr. Madison and Mr. Mink in the prosecution of their case against Mr.

21

Theodore; (4) examples of numerous instances where Mr. Madison and Mr. Mink directed Ms. Wax-Semus to do or not do certain things and her acceptance of the directives; (5) examples of instances where Ms. Wax-Semus assisted Mr. and Mrs. Madison and Mr. Mink in developing alleged evidence to support their maliciously prosecuted lawsuit against Mr. Pastore and [Spielfogel]; (6) examples of other instances of completely inappropriate conduct." Spielfogel also attached to his declaration Wax-Semus's and Mink's invoices for services performed in the dissolution action.

For example, Spielfogel referenced an email Kyle sent Wax-Semus and Mink on November 12, 2014 in which Kyle stated: "Hi Pamela: You indicated that Mr. Theodore has provided you with 7,000 pages of expense documents for both Casa W and Casa Theodore, which he has failed to produce to [Mink] or myself. Do you believe that the documents produced are within the scope of your assignment? If you do not, please inquire with Mr. Theodore or his counsel why they believe it to be relevant to your task. We look forward to your response. Thank you." Regarding this email and the other emails Spielfogel quoted regarding Wax-Semus, Spielfogel stated: "I did not consent to this significant ex parte communication, especially one going to substantive issues and to the scope of Ms. Wax-Semus's assignment. . . . The above and other facts and documents referenced in this declaration demonstrate that she was at the beck and call of Mr. Mink and Mr. Madison and that she accepted directives from one of the parties in the matter in which she was appointed. Ms. Wax-Semus never alerted me to the high volume of substantive ex parte communications, loaded with evidentiary and prejudicial

22

matter. Ms. Wax-Semus clearly stepped out of her proper role as a neutral arm of the Court."

Spielfogel further stated that on January 8, 2015 "Mr. Mink outrageously direct[ed] Ms. Wax-Semus as follows: 'Please correct your conclusion and omit the recommendation that disregards Judge Mackey's deadline. In other words, just assume that the documents you have are the only ones you are going to get.'" Spielfogel further stated: "Ms. Wax-Semus's bill for services allegedly rendered in May of 2015 contained numerous entries demonstrating her alliance with [the Madisons] and that she had become an expert for [the Madisons], including, but not limited to: (1) 'reviewing transcripts;' (2) 'preparing for rebuttal testimony;' and (3) 'assisting on preparation for trial.' . . . I did not give her any transcripts to review. I did not ask her to assist in preparation for trial. I did not ask her to 'prepare for rebuttal testimony.' This is powerful evidence that she had abandoned the role of neutral and independent expert and became part of [the Madisons's] team."

Spielfogel also pointed out that, after Diamond's appointment as liquidator in March 2016, the ex parte communications among Mink, Kyle, and Wax-Semus now included Diamond or Danning Gill. Spielfogel attached Diamond's and Danning Gill's billing statements to his declaration. Spielfogel also attached to his declaration numerous email communications among Diamond, Danning Gill, Wax-Semus, Kyle, or Mink. For example, Spielfogel quoted an email Mink sent to Diamond and Danning Gill on March 26, 2016 in which Mink stated: "I would take no comfort in getting the keys to the house from Theodore-The-Thief. [¶] Knowing him the way we do, it would not surprise us if he had the keys duplicated and

23

was renting out the house as he was looking you in the eye and telling you that he was not. That's why you not only need to fine tune your bullshit meter, you also need boots on the ground to see what's really happening with the house. Needless to say those boots cannot belong to someone who knows Theodore and is somehow loyal to him or can be bribed." Regarding this email and the other emails Spielfogel quoted that Diamond and/or Dunning Gill sent or received, Spielfogel stated: "At the time that this email was transmitted, I did not know of, or consent to, said ex parte communication. I certainly never consented to Mr. Mink or Mr. Madison instructing Mr. Diamond how to do his job. I was not given the opportunity to respond to this communication."

Spielfogel also set forth an April 5, 2016 email Mink sent to Diamond, Kyle and Danning Gill in which Mink stated, "Richard: In view of our discussion, it looks like I will need your declaration to get the judge to expand the accounts you have access to?" Spielfogel also quoted an April 9, 2016 email from Mink to Danning Gill in which Mink stated: "Aaron: Please try to include a reference to Panama in the declaration if it's admissible and not awkward. That is, when Richard tried to reach Theodore, he found out he was in Panama. Where did that come from? Hearsay?" Spielfogel further quoted an email from Mink to Diamond and Danning Gill dated April 17, 2016. In this email, Mink stated: "Richard: Here is a very rough draft of (1) an application to amend the March 4 order, and (2) the proposed order. Please give me your comments tomorrow or at your earliest convenience. Also, please give me your proposed changes for your declaration, based on what you received from Theodore on Friday." Spielfogel also quoted an email dated June 17, 2016

24

sent from Wax-Semus to Diamond, Danning Gill, and Mink. Wax-Semus stated: "Gentlemen: Please subpoena a newly discovered bank account. Bank of America account number 80002147115 held in the name of Casa Theodore Inc. I have also attached evidence that Mr. Theodore has deposited [Casa W] income into his personal bank account in August of 2014. After I complete by review of the documents received today, I know I will require additional subpoenas."

### e. *Theodore Declaration*

In a declaration submitted in opposition to the special motions to strike, Theodore stated: "I have paid to Ms. Wax-Semus $124,933.72. Because Ms. Wax-Semus has been removed and disqualified, the entirety of this expenditure has been wasted. Moreover, it is very upsetting to me that as it turns out I have been forced to fund Wax-Semus' role as part of [Madisons'] litigation team. In particular, I think it is outrageous that I personally funded at least one half of Wax-Semus'[s] time in generating schedules that were later used to sue Mr. Spielfogel and Mr. Pastore." Theodore further stated, "I personally have paid $193,347.87 to [Diamond] and [Danning Gill]. This does not include additional amounts that [Diamond] took from [Casa W]."

### 5. *Replies*

Mink argued, "First [Theodore] cites no case in which a lawyer's communications with a court-appointed expert was held to be outside the anti-SLAPP statute or the litigation privilege. Second [Theodore] cites no case in which such conduct was held to be criminal." Mink argued that Theodore "may not avoid the litigation privilege by charactering Mink's conduct as criminal or a conspiracy" because "the gravamen of [Theodore's] claim

against [the Madisons] is based solely on their communicative conduct in ongoing litigation." In their reply, the Madisons pointed out Theodore's argument that "the Madisons are vicariously liable for Mink's communication because they are his client" was "unsupported by law or logic." According to the Madisons, there was no authority for the proposition "that a client is vicariously liable for her attorney's alleged torts or alleged 'criminal conduct.'" The Madisons also argued that Theodore "provide[d] no evidence that any of the utterances complained of were criminal." The Madisons further argued that Theodore's attempt to relabel certain of the causes of action as breaches of a "'duty arising out of the partnership' . . . doesn't work" because each cause of action "rests on the same litigation-related conduct that is the gist of the pleading as a whole."

In her reply, Wax-Semus argued that she engaged in protected activities because "the conduct complained of by [Theodore] does not as a matter of law constitute a crime." Wax-Semus added, "While the [trial court's] findings of the court were sufficient to disqualify [Wax-Semus] as both the court appointed §639 referee and the court appointed §730 expert, those facts are not sufficient for a preliminary finding that [Wax-Semus] engaged in criminal activity." Wax-Semus continued, "[T]he court may have found that she failed to abide by the standards imposed upon judicial officers, but did not find that her conduct was beyond judicial function. As such, her conduct is immune from liability as she was performing a quasi-judicial act." Wax-Semus further argued, "[E]ven assuming that [Wax-Semus] has become the Madisons' expert, which is not conceded, she is still protected from liability under the litigation privilege" because "under the litigation privilege, an adverse expert witness is

26

immune from liability for statements made in the court of the litigation."

D. *Trial Court Rulings*

The trial court granted the three special motions to strike. In granting Mink's special motion to strike the first amended complaint, by order dated May 30, 2018, the trial court ruled that the causes of action alleged against Mink arose from Mink's "conduct as a lawyer in [the dissolution action]" and were based on Mink's communications "with Wax-Semus regarding testimony in [the dissolution action]" and "with Diamond regarding liquidation and management of the subject property in [the dissolution action]." Because Mink's communications with Wax-Semus and Diamond concerned "an issue under consideration or review by a judicial body," Mink's activities were protected under section 425.16, subdivision (e)(2). As to Theodore demonstrating a probability of prevailing on his claims, the trial court ruled, "[Theodore] does not demonstrate that the [first amended complaint] is legally sufficient. [Theodore] does not proceed through each cause of action and demonstrate that each essential element is pled in the Complaint. [Theodore] does not identify the elements in Penal Code sections 127, 133, 135, 484, and 496, or in Business and Professions Code section 6128, or for a RICO claim. Nor does [Theodore] identify the elements for aiding and abetting breach of fiduciary duty, conspiracy to defraud, constructive fraud, negligent misrepresentation, or conspiring to defraud."

The trial court further ruled, "[Theodore] offers no facts supporting the causes of actions in the opposition. [Theodore's] statements are conclusory. Stating 'there is a mountain of evidence' is insufficient to establish any elements of the claims.

27

[Theodore's] 'Factual Statement' section in [his] opposition does not provide sufficient facts for each element or tie any floating quote to an element of a cause of action. Further, the compendium of exhibits submitted appears to only show that Mink engaged in numerous ex parte communications with the third party neutral fraud examiner and liquidator. It is not clear, and would be a great leap to infer, that Mink aided and abetted or colluded with them to procure funds from [Theodore] under false pretenses, to defraud [Theodore], to breach their fiduciary duty to [Theodore], to interfere with their contract with [Theodore], to constructively defraud [Theodore], or for negligent misrepresentation." The trial court concluded, "Accordingly, [Theodore] has not met his burden to demonstrate a probability of prevailing on its claims."

In the order dated June 6, 2018 granting Wax-Semus's motion, the trial court ruled, "As for step one of the SLAPP analysis, the Court concludes that the SLAPP statute applies, including because moving party does not admit acting sufficiently illegally, and the evidence does not conclusively show it, as distinguished from disputes in the evidence. [¶] The SLAPP statute is inapposite to illegal speech, which means that the moving party concedes that its conduct was criminal, or that the evidence conclusively establishes it. . . . As for step two, the Court determines that judicial immunity, and the litigation privilege, are conclusively shown, without any applicable, and competently evidenced, exceptions. [¶] Specifically, [Theodore's] allegations and evidence of communications amounting to ethics violations of ex parte communications and bias, and the conduct of overbilling that [Theodore] essentially calls false pretenses, nevertheless were associated with dealing with [Wax-Semus] while

28

functioning within court-authorized jurisdiction, as a court-appointed expert or referee, and involving inseparable communications in furtherance of litigation, such that immunity and the privilege apply."

Without setting forth its reasoning, by order dated May 31, 2018, the trial court granted the Madisons' special motion to strike. On June 15, 2018, the trial court sustained Diamond's and Danning Gill's demurrers to the first amended complaint without leave to amend and granted their motions to strike. On July 13, 2018, the trial court awarded Mink and the Madisons $23,212.50 in attorney fees and, on July 30, 2018, the trial court awarded Wax-Semus $31,980 in attorney fees and costs. On October 4, 2018, the trial court entered judgments against Theodore in favor of Mink, the Madisons, and Wax-Semus.

In early 2020, Diamond and Danning Gill, on the one hand, and the Madisons and Theodore, on the other hand, settled their claims regarding the funds owing to Diamond and Danning Gill. By order dated May 19, 2020, this court dismissed Theodore's appeal (B294219) based on the judgment dated October 4, 2018 dismissing Theodore's claims against Diamond and Danning Gill.

Theodore timely appealed.

## DISCUSSION

A. *Section 425.16: The Anti-SLAPP Statute* [10]

"'Section 425.16 provides, inter alia, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under

---

[10] SLAPP is an acronym for "strategic lawsuit against public participation." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 815, fn. 1.)

the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.'''" (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 642 (*Newport Harbor*); accord, *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 938 (*Sweetwater*).) "Section 425.16 'provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.' [Citation.] 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPPs] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." [Citation.] Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought "'to prevent SLAPPs by ending them early and without great cost to the SLAPP target'" [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation. [Citation.] In doing so, section 425.16 seeks to limit the costs of defending against such a lawsuit.'" (*Newport Harbor*, at p. 642.)

Courts evaluate a special motion to strike under section 425.16 "through a two-step process. Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*); see *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*). "A claim arises from

protected activity when that activity underlies or forms the basis for the claim. [Citations.] Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citations.] . . . 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e). . . .' [Citation.] In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park*, at pp. 1062-1063.) "If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.'" (*Id.* at p. 1061; accord, *Baral,* at p. 384.)

We review a trial court's ruling on a special motion to strike under section 425.16 de novo. (*Park*, *supra,* 2 Cal.5th at p. 1067; accord, *Sweetwater, supra,* 6 Cal.5th at p. 940; see *Moss Bros. Toy, Inc. v. Ruiz* (2018) 27 Cal.App.5th 424, 433 ["we exercise our independent judgment in determining whether the challenged claim arises from protected activity"].) We consider "'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (§ 425.16, subd. (b)(2); see *Sweetwater*, at p. 941; *Park,* at p. 1067; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67; *Moss Bros. Toy, Inc.,* at p. 433.) "We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park,*

at p. 1067; accord, *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)[11]

B. *The Complaint Arises From Protected Activity*

Section 425.16, subdivision (e), expressly defines an "'act in furtherance of a person's right of petition'" to include "any written or oral statement or writing made before a . . . judicial proceeding, or any other official proceeding authorized by law" and "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(1), (2); see *Newport Harbor, supra,* 4 Cal.5th at p. 642.) "'Any act' includes communicative conduct such as the filing, funding, and prosecution of a civil action [citation]," including "qualifying acts committed by attorneys in representing clients in litigation." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056; see *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1388 ["[t]he anti-SLAPP statutes

---

[11] Relying on *Newport Harbor, supra,* 4 Cal.5th 637, Theodore argues that the three special motions to strike were not timely filed. However, Wax-Semus, the Madisons, and Mink promptly filed their motions shortly after Theodore filed the complaint and first amended complaint. In *Newport Harbor*, the California Supreme Court held: "[A]s the trial court noted when it exercised its discretion to deny a late filing, much litigation, including discovery, had already been conducted for two years before the anti-SLAPP motion brought it to a halt. It is far too late for the anti-SLAPP statute to fulfill its purpose of resolving the case promptly and inexpensively. 'An anti-SLAPP motion is not a vehicle for a defendant to obtain a dismissal of claims in the middle of litigation; it is a procedural device to prevent costly, unmeritorious litigation at the initiation of the lawsuit.'" (*Id.* at p. 645.) Here, there was no such delay or discovery taken.

protect not only the litigants, but also their attorneys' litigation-related statements"].)

Cases construing the anti-SLAPP statute hold that "a statement is 'in connection with' litigation under section 425.16, subdivision (e)(2), if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation." (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266, 1270; accord, *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115; *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 779; *Bergstein, supra,* 236 Cal.App.4th at pp. 803-804.) In fact, courts have adopted "a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908; see *Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 210 ["'all communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute"]; *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537 ["protection for petitioning activities applies not only to the filing of lawsuits, but extends to conduct that relates to such litigation, including statements made in connection with . . . litigation"].)

In *Bergstein*, *supra*, 236 Cal.App.4th 793, the plaintiffs sued lawyers who represented their adversaries in litigation concerning various financial transactions. The plaintiffs asserted that the lawyers engaged in tortious conduct when they "'solicited and received . . . confidential, privileged, and/or proprietary information'" from plaintiffs' former attorney and "used that

33

information 'in devising the legal strategy to be employed' in the litigation against plaintiffs." (*Id*. at p. 797.) Effectively serving as plaintiffs' general counsel, "[the former attorney] was intimately familiar with and had access to plaintiffs' confidential, privileged and proprietary information, including core operating and financial documents, electronic records and other records, and was the custodian of critical documents related to plaintiffs." (*Id*. at p. 798.) The plaintiffs alleged that the former attorney "'worked hand-in-hand'" with the defendant lawyers preparing and orchestrating legal proceedings against plaintiffs using the privileged and confidential information. (*Id*. at pp. 800-801) The lawyers "attempted to hide their conduct" involving the plaintiffs' former attorney by channeling the email communications through an intermediary. (*Id*. at p. 801.)

The trial court granted the defendant-lawyers' special motion to strike under the anti-SLAPP statute, concluding that the complaint arose from protected activity. (*Bergstein, supra,* 236 Cal.App.4th at p. 797.) The plaintiffs appealed, contending that the attorneys were not being sued for "any written or oral statement they made in a judicial proceeding," but rather for the "unprotected conduct of aiding and abetting" the former attorney's breach of fiduciary duties to plaintiffs, for "interfering" with the plaintiffs' former attorney's "contractual obligation" to maintain confidential information, and for interfering with plaintiffs' "prospective economic advantage." (*Id*. at p. 811.) Affirming the trial court, the court explained that the anti-SLAPP statute's definitional focus "'is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.'" (*Ibid*.) The

34

court examined "'the specific acts of wrongdoing' alleged, 'without particular heed to the form of action within which it has been framed.'" (*Ibid*.) Plaintiffs alleged causes of action against defendants based on their use of known confidential and privileged information to prosecute their litigation attack. The court pointed out, [¶] "Plainly, 'aiding and abetting the breach of [plaintiffs' former attorney's] fiduciary duties' and 'interfering with [that attorney's] contractual obligation to [plaintiffs] to maintain their confidences' are the causes of action plaintiffs assert, not the 'specific acts of alleged wrongdoing' that give rise to those causes of action." (*Ibid*.) The court held, "Almost all of the 'specific acts of alleged wrongdoing' in the complaint [were] litigation activities." (*Ibid*.) Holding that "it is precisely defendants' advocacy on behalf of their clients in . . . litigation that forms the basis for all of plaintiffs' causes of action," the court concluded, "Defendants' litigation activities are at the core of plaintiffs' claims. Clearly those claims arise from protected activity within the meaning of the anti-SLAPP statute." (*Id*. at pp. 811, 813.)

Here, based on what he described as "rampant," "pervasive," and "illegal ex parte communications of a strategic and substantive nature" among defendants, Theodore filed this action challenging the manner in which the Evidence Code section 730 expert/referee and the court-appointed liquidator, as well as opposing parties and their counsel, conducted themselves in the dissolution action. Theodore asserted that defendants wrongfully excluded Theodore from their litigation communications, "teamed up" to prosecute the dissolution action against him, and disparaged Theodore in their communications. To plead his claims, Theodore used email communications among

35

defendants.[12]  Theodore's claims would not exist in the absence of the communications.  The communications were transmitted among persons having an interest in the dissolution action, and they solely concerned subjects at issue in the action.  The actions that defendants took as a result of these communications, such as revising pleadings, requesting subpoenas and documents, reviewing document productions, making arguments in court and otherwise prosecuting the dissolution action, were protected petitioning activities.  Mink's alleged malicious filing of the conversion action against Spielfogel and Pastore was also protected petitioning activity.[13]

Theodore's claims were thus entirely premised on defendants' litigation-related communications and activities.  Accordingly, the trial court correctly concluded that Theodore's claims "'arise from'" and were "'based'" on protected activity in connection with pending judicial matters.  (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89-90 [action alleging "misrepresentations and omission" in connection with the

---

[12]    In his opposition to the special motions to strike, Spielfogel also quoted the emails at length in his declaration and attached 300 pages of these communications.

[13]    Theodore alleged further petitioning activity in connection with the dissolution action.  He asserted that Wax-Semus, Diamond, and Danning Gill submitted excessive bills for their work in the dissolution action.  In rejecting Theodore's claim that Wax-Semus forfeit her fees, the trial court ruled Theodore could assert his objections at the conclusion of dissolution action pursuant to Evidence Code section 731.  After the trial court rejected Theodore's objections to Diamond's and Danning Gill's fees and ordered Theodore and the Madisons to pay them, the parties settled their claims regarding the fees.

execution of a release, the wrongful filing of a counterclaim containing the released claims, and false arguments in court about the released claims "falls squarely within the ambit of the anti-SLAPP statute 'arising from' prong"]; *Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 114-115 ["Plaintiff's claims against Defendants [are] based on protected activity, namely Defendants' representation of [their client] in litigation (the state court action and the federal forfeiture action)"]; *JSJ Limited Partnership v. Mehrban* (2012) 205 Cal.App.4th 1512, 1521 ["[f]iling a lawsuit is an act in furtherance of the constitutional right of petition, regardless of whether it has merit"]; *Booker v. Rountree* (2007) 155 Cal.App.4th 1366, 1370 ["[T]here is no doubt the cross-complaint arises out the underlying litigation, so it is subject to the anti-SLAPP statute. [T]he claim is misconduct *in* the underlying litigation"]; see also *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741 [malicious prosecution action by its very nature arises out of defendant's constitutionally protected petitioning activity (the underlying lawsuit)].)

Theodore does not challenge that his claims were based on defendants' communications and litigation conduct.[14] Rather,

---

[14] Citing *Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388 (*Optional Capital*), Theodore suggests that "[a] conspiracy and a course of conduct are independent non-communicative acts not within the purview of [Civil Code] § 47 or Section 425.16." Theodore also suggests, citing *Greco v. Greco* (2016) 2 Cal.App.5th 810, that the "wrongful taking of money is not protected activity." However, neither *Optional Capital* nor *Greco* supports Theodore's broad assertions. In *Optional Capital*, the court held that a conspiracy "to assert dominion and control over the funds in which [plaintiff] has a judgment lien and

37

Theodore argues, "Because § 425.16 does not apply to criminal conduct, the Trial Court did not even have to go the second step of the analysis." Theodore contends that Wax-Semus, Diamond, and Danning Gill violated Penal Code section 484. According to Theodore, "PC Section 484 makes it a crime to procure money or property under false pretenses," and "the procurement of money, including money paid consensually, violates section 484." Because section 484 "is linked to [Penal Code] section 496 which specifies that anyone who aides the perpetrator of the theft is also liable," the Madisons and Mink also committed crimes. Theodore further argues that the lawyer-defendants—Kyle, Mink, Diamond, and Danning Gill—"specifically violated [Business and Professions Code] section 6128, to the effect that an attorney was guilty of a misdemeanor if he engages in deceit

transfer of those funds out of [plaintiff's] reach in violation of rights as a judgment creditor" alleged "an independent, noncommunicative, wrongful act." (*Optional Capital,* at p. 1405.) The court held that the complaint "seek[ing] to recover monies looted" from plaintiff did not arise from litigation. (*Id.* at pp. 1400-1401.) In *Greco,* the court held that the gravamen of the plaintiff's claims was "the alleged wrongful taking [of money] from the trust and estates." (*Id.* at p. 815.) The conduct was not protected activity because plaintiff's "claim for recovery was not based on the wrongful act of pursuing meritless or wasteful litigation, but on taking trust and estate funds." (*Id.* at p. 823.) Here, Wax-Semus's and Diamond's payments were part of the dissolution action because the trial court approved the payments. Further, "labels" such as "conspiracy" and "aided and abetted" have little relevance in determining whether activity is protected under section 425.16. (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 410.)

or collusion or consents to deceit or collusion with intent to deceive a court or a party."

Throughout his opening brief, Theodore asserts that Wax-Semus, Mink, and the Madisons "violated criminal statutes." He maintains that the Spielfogel declaration and its attachments establish the criminal conduct. While it is true that a special motion to strike cannot be used by a defendant whose allegedly protected activity was illegal (*Flatley, supra,* 39 Cal.4th at p. 320), Theodore's illegality arguments do not assist him. In *Flatley,* the California Supreme Court held "where a defendant brings a motion to strike under section 425.16 based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." [15] (*Ibid.*) This is because a defendant whose

---

[15] In *Flatley*, the plaintiff, a well-known entertainer, filed an action against an attorney, alleging causes of action for civil extortion, intentional infliction of emotional distress and wrongful interference with economic advantage. The plaintiff's causes of action were based on a letter from the lawyer threatening to make public a rape allegation unless the plaintiff paid a "'settlement of $100,000,000.00.'" (*Flatley*, *supra,* 39 Cal.4th at pp. 305-308.) The defendant lawyer admitted writing letters and making calls to the plaintiff and his attorneys. The Supreme Court concluded that "based on the specific and extreme circumstances of the case," the defendant's conduct therein, which amounted to "criminal extortion as a matter of law," was not entitled to the protection of the anti-SLAPP statute. (*Id.* at p. 332, fn. 16.)

assertedly protected activity is "illegal as a matter of law" is "not protected by constitutional guarantees of free speech and petition." (*Id.* at p. 317.) Illegal in this context "refers to criminal conduct; merely violating a statute is not sufficient . . . ." (*Aron v. WIB Holdings* (2018) 21 Cal.App.5th 1069, 1083; *Collier v. Harris* (2015) 240 Cal.App.4th 41, 55; *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654.) Furthermore, if "a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step [of the anti-SLAPP analysis] but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Flatley,* at p. 316; see *Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 446 ["[w]e understand *Flatley* to stand for this proposition: when a defendant's assertedly protected activity may or may not be criminal activity, the defendant may invoke the anti-SLAPP statute unless the activity is criminal as a matter of law"].)

Court after court has recognized that the *Flatley* exception is a "narrow" one to be applied only when the defendant concedes the illegality or the evidence "conclusively establishes" illegality "as a matter of law." (*Optional Capital, Inc. v. Akin Gump Strauss Haver & Feld LLP, supra*, 18 Cal.App.5th at p. 115, fn. 7 ["[a] long line of cases have concluded in the wake of *Flatley* that its exception for illegal conduct is a 'very narrow' one"]; *Bergstein, supra,* 236 Cal.App.4th at p. 806 ["case authorities after *Flatley* have found the *Flatley* rule applies only to criminal conduct, not to conduct that is illegal because in violation of statute or common law"]; *Zucchet v. Galardi* (2014) 229 Cal.App.4th 1466, 1478 ["the exception for illegal activity is very narrow and

40

applies only in undisputed cases of illegality"]; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 384, 386 [characterizing the *Flatley* circumstances as "narrow" and also concluding this was not "one of those *rare cases* in which there is uncontroverted and uncontested evidence that establishes the crime as a matter of law"].)

Defendants did not concede the alleged illegality, and Theodore's evidence of criminal conduct is far from conclusive that defendants' litigation-related activities were illegal. Indeed, rather than point to a concession of illegality or show illegal conduct as a matter of law, Theodore repeatedly conceded in the trial court that "each cause of action" contained "provable allegations" of criminal conduct.[16] For example, Theodore argues

---

[16] In *Towner v. County of Ventura* (2021) 63 Cal.App.5th 761 this court held that plaintiff "carried his burden to show the alleged conduct of the County defendants underlying his third and fifth causes of action was illegal as a matter of law under *Flatley* because it constituted a willful omission to perform a public duty enjoined by law (Gov. Code, § 1222), and was therefore not protected activity under the anti-SLAPP statute." (*Towner*, at p. 774.) In *Towner*, defendants chose not to factually contest the alleged illegality and conceded they willfully did not follow the requirements of Government Code section 1222. Instead, defendants in *Towner* asserted a legal argument; they were not obligated to comply with their public duty because they qualified for a statutory exception. (*Id*. at p. 767-768.) In holding that the conduct "was illegal as a matter of law," we rejected defendants' reliance on the "limited exception." (*Id*. at p. 770-774.) In contrast, here the illegality of defendants' conduct does not turn on a legal question of statutory interpretation. To the contrary, Theodore argued that defendants' criminal conduct was factually "provable."

that the attorney-defendants violated Business and Professions Code section 6128, which provides: "Every attorney is guilty of a misdemeanor who either: [¶] (a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . ." However, excluding Spielfogel from litigation communications does not establish illegality as a matter of law. (*Flatley, supra,* 39 Cal.4th at p. 320; see *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 965 [factually disputed allegation of attorney fraud under Bus. & Prof. Code, § 6128 insufficient to meet *Flatley* standard of illegality].)

Among other things, Theodore has not presented evidence that the attorney-defendants acted with an "intent to deceive."[17] Based on the content of their communications, it is reasonable to infer that the attorney-defendants believed that Theodore was withholding information concerning Casa W and that he likely had misappropriated Casa W funds.[18] The communications reveal an effort to locate documents and funds and advance the dissolution action. While Mink's and Kyle's failure to include Spielfogel on their communications with Wax-Semus and Diamond was "deeply troubling" to the trial court, Theodore has

---

[17] Based on a remark that Mink made at Diamond's deposition in the dissolution action, Theodore states that "Mink admitted he was receiving a 10% kickback from amounts paid to Diamond." As Mink explained in a declaration, he made a "facetious remark"—"Less my 10 percent." Diamond testified that he was not paying Mink anything, and there is no evidence of any payments.

[18] There is a $3.9 million judgment against Theodore based on the trial court's finding that Theodore breached his fiduciary duty owing to the Madisons.

not conclusively established criminal conduct. (See *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1169 [anti-SLAPP statute not inapplicable because attorney's unethical conduct did not rise to "criminal conduct"]; *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 477 [litigation conduct by attorneys allegedly in violation of statutes authorizing treble damages for assisting in the evasion of child support obligations was not "illegal" within the meaning of the rule from *Flatley*]; *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285 ["'[c]onduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage . . . simply because it is *alleged* to have been unlawful or unethical'"].)

Nor has Theodore conclusively established criminal conduct under Penal Code sections 484 and 496. Section 484, subdivision (a), provides, "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft." (See *People v. Gomez* (2008) 43 Cal.4th 249, 255, fn. 4 ["[i]n 1927, the crimes of theft by larceny, embezzlement, and false pretenses were consolidated in section 484"].) Given that the trial court appointed Wax-Semus and Diamond and ordered Theodore and the Madisons to make payments to them, Theodore has not conclusively established the crime of theft based on these court-ordered payments. Also, Theodore has not conclusively established that Mink and the Madisons received "stolen property" in violation of Penal Code section 496, subdivision (a). "In order to establish the commission of the crime of receiving stolen property on a theory of a larcenous taking, it must be established by substantial evidence (1) that the particular property was stolen, (2) that the

43

accused received, concealed or withheld it from the owner thereof, and (3) that the accused knew that the property was stolen." (*People v. Moses* (1990) 217 Cal.App.3d 1245, 1250.) Among other things, Theodore has not identified the "stolen property" that Mink and the Madisons allegedly received. (See *Switzer v. Wood* (2019) 35 Cal.App.5th 116, 127 ["[a] violation of section 496(a) may, by its own terms, relate to property that has been 'stolen' or 'that has been obtained *in any manner constituting theft* or extortion'"].)[19]

While Mink's and Kyle's tactics in the dissolution action leave a lot to be desired, they were protected activity under section 425.16. (See *Summerfield v. Randolph* (2011) 201 Cal.App.4th 127, 136 [allegedly false affidavits filed in support of litigation constitute protected activity]; *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1549 ["whether or not a defendant's statements were false does not determine whether they constitute protected activity for purposes of the SLAPP statute" because the statute "pertains to '*any* written or oral statement or writing made in connection with an issue under consideration or review by a judicial body'"].)

---

[19] The California Supreme Court granted review in *Siry Investment, L.P. v. Farkhndehpour*, S262081, on May 8, 2020, and asked the parties to brief and argue issues including: "May a trial court award treble damages and attorney fees under Penal Code section 496, subdivision (c), in a case involving the fraudulent diversion of business funds rather than trafficking in stolen goods?"

C. *Theodore Failed To Demonstrate a Probability of Prevailing on His Claims*

1. *Theodore Failed To Establish That His Claims Were Legally Sufficient and Supported by a Sufficient Prima Facie Showing of Facts*

If the defendant makes a prima facie showing that the plaintiff's claims arises from constitutionally protected petitioning or free speech activity, then the burden shifts to plaintiff to establish, with admissible evidence, a "probability" of prevailing on the claims challenged by the anti-SLAPP motion. (See § 425.16, subd. (b); *Sweetwater, supra,* 6 Cal.5th at p. 940; *Baral, supra,* 1 Cal.5th at p. 384.) At step two, the burden is on the plaintiff to show that it has "stated and substantiated a legally sufficient claim." (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1123; accord, *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 412.) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral, supra,* 1 Cal.5th at pp. 384-385; accord, *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) Accordingly, as explained in *Baral*, the second step of the analysis under section 425.16 requires a plaintiff to separately establish a probability of prevailing on each distinct claim for relief: "[T]he plaintiff must make the requisite showing as to each challenged claim that is based on allegations of protected activity." (*Baral*, at p. 392.)

In granting the special motions to strike, the trial court found, "[Theodore] does not demonstrate the [first amended complaint] is legally sufficient. [Theodore] . . . does not demonstrate that each essential element is pled. . . . [¶]

45

[Theodore] offers no facts supporting the causes of action. . . . Stating 'there is a mountain of evidence' is insufficient to establish any elements of the claims." In the trial court, Theodore's conclusory approach to legal sufficiency and his "mountain of evidence" argument failed to make the required showing. Here, Theodore continues in the same deficient conclusory fashion, without citation to pertinent legal authority or a discussion of the elements of his claims, arguing that he established their legal sufficiency. His argument that the evidence is "overwhelming," with citation to virtually the entire record, is not a prima facie showing of merit. Theodore has thus not carried his burden to demonstrate a probability of prevailing on his claims. (See *Baral, supra,* 1 Cal.5th at pp. 384-385 [the court's inquiry "is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment"].)

For example, regarding the first and second causes of action against Wax-Semus for fraud and negligent misrepresentation, Theodore states: "The essence of these counts is that Wax-Semus, in conspiracy with, and aided and abetted by, Mink and Kyle engaged in rampant acts of misconduct designed to procure funds from Theodore under false pretenses. . . . [¶] Wax-Semus was supposed to be an independent agent of the court. Instead, as [the trial court] found, Wax-Semus was not independent, but became a part of the Madisons' litigation team. Adding insult to injury, Theodore lost over $124,000, as a result of the conspiracy and severe misconduct by Wax-Semus, Mink and Kyle." Theodore then cites to several hundred pages of the record, including all the attachments to the Spielfogel

declaration. Theodore's complaint is little help in attempting to identify the elements of these claims.

Among other deficiencies, Theodore has not set forth the alleged misrepresentations to support these claims with the required specificity. (See *Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 837-838 ["[f]raud must be pleaded specifically with facts showing how, when, where, to whom, and by what means representations are tendered; general and conclusory allegations do not suffice"]; *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1167 ["[c]auses of action for intentional and negligent misrepresentation sound in fraud and, therefore, each element must be pleaded with specificity"].) By citing to virtually the entire record for factual support as he did in the trial court, Theodore fails to make a prima facie factual showing in support of the claims sufficient to sustain a judgment. Therefore, Theodore did not carry his burden to show a probability of success on the merits. Theodore makes the same deficient showing regarding his claim that Mink and the Madisons aided and abetted Wax-Semus in connection with these causes of action. Similarly, Theodore fails to make the requisite showing regarding the twenty-second cause of action against Mink and the Madisons for aiding and abetting Diamond's alleged fraud.

Regarding the eighth cause of action against Wax-Semus for interference with the contract between Theodore and the Madisons, Theodore states, "Wax-Semus promised to be neutral and ethical. Even if she did not so contract, she was required to be neutral and ethical by operation of law." Theodore refers to the same several hundred pages of the record. Theodore's conclusory statements, without legal citations, thus fail to

47

demonstrate a legally sufficient claim against Wax-Semus. Theodore has not explained how Wax-Semus could have interfered with the Casa W agreement given that Wax-Semus only became involved after the trial court appointed her to conduct a forensic accounting analysis in the dissolution action. Theodore makes similar conclusory statements and references regarding the nineteenth cause of action against Mink and the Madisons for interfering with Theodore's alleged contracts with Wax-Semus and Diamond. Theodore provides no legal authority supporting the viability of these claims or any discussion of evidence. Theodore does not identify his alleged contracts with Diamond and Wax-Semus.[20]

---

[20] In his twenty-first cause of action against the Madisons for "defamation/false light," Theodore alleged that Kyle engaged in "defamation per se" of Theodore "and placed him in false light by falsely advising a prominent property management firm that [Theodore] had misappropriated funds, and had engaged in other corrupt and unethical acts." Theodore repeats this allegation in his opening brief without any more specificity concerning what Kyle allegedly communicated, the date of the communication, or the recipients of the communication. Theodore failed to establish the legal sufficiency of this cause of action. (See *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 951 ["plaintiff's complaint is defective because it ""does not allege either the specific words or the substance of [the] statements . . . but instead merely alleges the conclusions of the pleader that statements were made which 'intimated and suggested' that plaintiff had done certain wrongful things"""]; see also *Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 646 ["[i]n all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose"].) Nor did Theodore

Regarding the ninth and tenth causes of action against Mink for aiding and abetting Diamond's breach of fiduciary duty and constructive fraud, Theodore states: "[He] presented substantial evidence by which the trier of fact could conclude that Mink aided and abetted breaches of fiduciary duty and constructive fraud by Diamond." However, in addition to his failure to identify relevant legal authority, Theodore does not explain how he can state a legally sufficient claim for breach of fiduciary duty against a court-appointed liquidator. (See *Howard v. Drapkin* (1990) 222 Cal.App.3d 843, 858-859 [quasi-judicial immunity afforded to "court-appointed persons (such as . . . receivers)"].) The trial court appointed Diamond with broad authority "to wind up all [Casa W] affairs" "in his sole discretion" and approved Diamond's fees after rejecting Theodore's objections. Theodore also did not identify a "confidential relationship" that could support Diamond's fiduciary duty. (See *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 417 ["[a] fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another . . . a confidential relationship arises 'where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed, . . . voluntarily accepts or assumes to accept the confidence'"].)[21] Nor has Theodore adequately

make any prima facie factual showing regarding this cause of action.

[21] Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint venturers, and agent/principal. (See, e.g., *Evangelho v. Presoto*

49

supported a legally sufficient claim for constructive fraud against Diamond. (See *Michel v. Moore & Associates, Inc.* (2007) 156 Cal.App.4th 756, 762 [""[c]onstructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship""].)[22]

---

(1998) 67 Cal.App.4th 615, 621 [trustee and beneficiary]; *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108-109 [controlling shareholder of corporation]; *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 818-819 [joint venturers]; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1580 [agent/principal].)

[22] With regard to the sixteenth and seventeenth causes of action for breach of fiduciary duty and constructive fraud against the Madisons, Theodore argues, "The Madisons were Theodore's partners and as such owed Theodore a fiduciary duty. . . . Mink was the agent of the Madisons. . . . The Madisons, individually, and aided and abetted by Mink, breached [their] fiduciary duty owed to Theodore." As with the other breach of fiduciary duty and constructive fraud causes of action, Theodore fails to demonstrate legal sufficiency and cites to voluminous parts of the record. While the Madisons and Theodore were members of Casa W before the trial court dissolved it, Theodore does not explain how a fiduciary duty among them would govern their conduct as adversaries in litigation. Theodore makes similar deficient showings in support of the sixteenth cause of action against Wax-Semus and Mink for aiding and abetting the Madisons' alleged breach of fiduciary duty and the seventeenth cause of action against Mink for aiding and abetting the Madisons' breach of fiduciary duty and constructive fraud. Theodore's eighteenth cause of action against the Madisons for breach of the contract is also legally insufficient. Theodore fails to explain how the Madisons' prosecution of the dissolution action against him was a breach of a contract.

Regarding the twentieth cause of action "for wrongful appointment of the liquidator" asserted against the Madisons, after referring to a prior part of his opening brief,[23] Theodore asserts, "Diamond owed a fiduciary obligation to Theodore. The Madisons and Mink engaged in rampant misconduct, including transmitting highly disparaging and inaccurate ex parte communications and directing Diamond to do things to help the Madisons prosecute their claims against Theodore." Theodore again does not demonstrate the basis for Diamond's fiduciary duty or how Diamond's alleged fiduciary duty supports this claim. Theodore does not explain why his concerns about Diamond's conduct as the liquidator, which the trial court rejected in the dissolution action, can form the basis for claims against the Madisons and Mink in this action. As with his other causes of action, Theodore does not cite any legal authority to support this cause of action and generally cites to hundreds of record pages as evidence.

As to the twenty-third cause of action for RICO violations alleged against Diamond and Danning Gill aided and abetted by Mink and the Madisons,[24] after citing to virtually the entire

---

[23] The referenced part of Theodore's opening brief states: "If the receivership was unnecessary and *wrongfully obtained*, liability for the expenses and fees is properly placed upon the party who caused the unnecessary and wrongful appointment[]". See, Smith v. Hill (1965) 237 Cal.App.2d 374, 387, Stanton v. Pratt (1941) 18 Cal.2d 599, 603 and Lewis v. Hall (1918) 38 Cal.App.329, 336."

[24] Although the heading for this cause of action does not mention Wax-Semus, Theodore included allegations against Wax-Semus in this cause of action.

record, Theodore contends, "Theodore proved that Mink provided substantial support and assistance to both Wax-Semus and Diamond, in generating false bills and thereby aided and abetted them relative to their respective RICO violations." Regarding the Madisons, Theodore adds: "Theodore alleged in the [first amended complaint] that Diamond and [Danning Gill] (which is a separate entity from Diamond) had for decades engaged in a nefarious scheme to pilfer proceeds of disputed 'estates' as a receiver, a bankruptcy trustee and/or a liquidator and that Diamond/[Danning Gill] had acted with Mink on other legal cases where Diamond would be appointed as Receiver, bankruptcy trustee or liquidator. . . .[¶] Theodore proved that the Madisons and Mink provided substantial support and assistance to Wax-Semus and Diamond in generating false bills, and thereby aided and abetted them relative to their respective RICO violations."

The RICO statutes allow individuals to file suit and recover treble damages against individuals who, through a "pattern of racketeering activity," acquire an interest in, or conduct the business of, an enterprise engaged in interstate or foreign commerce. (18 U.S.C. §§ 1962(b), 1962(c), 1964(d).) Section 1962(c) prohibits conducting the affairs of an enterprise engaged in interstate or foreign commerce through a pattern of racketeering activities. To state a RICO claim under section 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (iv) of racketeering activity" and (v) injury in the plaintiffs' business or property by the conduct constituting the violation. (*Sedima, S.P.R.L. v. Imrex Co., Inc.* (1985) 473 U.S. 479, 496; *Sanford v. MemberWorks, Inc.*, (9th Cir. 2010) 625 F.3d 550, 557, 559.) "'The touchstone of [Section 1962(c)] is that each individual defendant must be shown to have personally

participated in a pattern of racketeering activity.'" (*Committee to Protect Our Agric. Water v. Occidental Oil and Gas Corp.* (E.D. Cal. 2017) 235 F.Supp.3d 1132, 1172 (*Committee to Protect*).)

Proper pleading of a pattern of racketeering activity requires the plaintiff to allege at least two predicate acts that are interrelated by distinguishing characteristics and amount to or pose a threat of continued criminal activity. (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 826; accord, *Turner v. Cook* (9th Cir. 2004) 362 F.3d 1219, 1229; *Committee to Protect, supra,* 235 F.Supp.3d at p. 1177.) Conclusory allegations of two predicate acts are legally insufficient to properly plead a pattern of racketeering activity. (*Rosenthal v. Vogt* (1991) 229 Cal.App.3d 69, 77; accord, *Schreiber Distributing v. Serv-Well Furniture Co.* (9th Cir. 1986) 806 F.2d 1393, 1401.)

The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4).) To show an association-in-fact enterprise, plaintiff must plead three elements. First, plaintiffs must plead a common purpose. (*Eclectic Props. E., LLC v. Marcus & Millichap Co.* (9th Cir. 2014) 751 F.3d 990, 997 (*Eclectic Props. E.*); *Odom v. Microsoft Corp.* (9th Cir. 2007) 486 F.3d 541, 552.) To show a common purpose, plaintiff must allege that the group engaged in enterprise conduct distinct from their own affairs. Second, plaintiff must plead an ongoing structure or organization to the enterprise, which may be either formal or informal. (*United States v. Turkette* (1981) 452 U.S. 576, 583; *Eclectic Props. E.*, at p. 997; *Ellis v. J.P. Morgan Chase & Co.* (N.D. Cal. 2013) 950 F.Supp.2d

53

1062, 1089.) Third, plaintiff must plead that the enterprise had the longevity necessary to accomplish its purpose. (*Eclectic Props. E.,* at p. 997; *Odom v. Microsoft,* at p. 552.) Finally, plaintiff must allege facts indicating that the alleged associates in the enterprise, over time, "function[ed] as a continuing unit." (*United States v. Turkette,* at p. 583.)

In his opening brief, Theodore's only mention of the defendants in connection with the elements required for a RICO violation is: "Per 18 USC § 1961(4), Diamond, [Danning Gill] and Wax-Semus engaged in an 'enterprise' defined as 'any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' Hence, said Respondents clearly qualify as an enterprise." Likewise, in his complaint, Theodore did not even begin to adequately plead the required "enterprise." Theodore concluded that Wax-Semus and Diamond "engaged in an enterprise of great longevity" without any supporting facts. Theodore also fails to identify any predicate acts. Theodore's complaint stated that Diamond and Danning Gill "engaged in literally tens if not hundreds of activities constituting racketeering activities per RICO," but did not identify any. Theodore failed to establish that he plead a legally sufficient RICO cause of action. He also failed to make the required prima facie factual showing.[25]

---

[25]     In *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, the court reversed a trial court's denial of an anti-SLAPP motion challenging a complaint that included a cause of action alleging RICO violations and thereby struck the RICO cause of action. (*Id.* at pp. 470, 480.) Without reaching whether the litigation

54

In sum, for all the causes of action in his complaint, Theodore fails to show that they are legally sufficient or that there is sufficient evidence to establish a prima facie case.[26]

privilege of Civil Code section 47, subdivision (b), barred plaintiffs' RICO claims, the *Premier Medical* court held that the *Noerr-Pennington* doctrine precluded plaintiffs' claims. (*Id.* at p. 478; see *Sosa v. DIRECTV, Inc.* (9th Cir. 2006) 437 F.3d 923, 930–933, 942 [*Noerr-Pennington* doctrine barred RICO claim based on "prelitigation demand to settle legal claims" because the "doctrine requires that, to the extent possible, we construe federal statutes so as to avoid burdens on activity arguably within the scope of the Petition Clause of the First Amendment"].) The *Noerr-Pennington* doctrine is based on the right to petition the government under the First Amendment to the United States Constitution. It originated in cases interpreting the federal antitrust laws to exclude liability for concerted action in connection with petitioning the government. (See *Eastern R. Pres. Conf. v. Noerr Motor Frgt., Inc.* (1961) 365 U.S. 127, 136; *United Mine Workers v. Pennington* (1965) 381 U.S. 657, 670.) This immunity was later applied to "situations where groups 'use . . . *courts* to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors.'" (*BE & K Constr. Co. v. NLRB* (2002) 536 U.S. 516, 525.) In *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, the court explained: "Obviously, '"the principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity [should be applied], regardless of the underlying cause of action asserted by the plaintiffs." [Citation.] "[T]o hold otherwise would effectively chill the defendants' First Amendment rights."'" (*Id.* at p. 21, fn. 17.)

[26] As stated, Theodore fails to cite any relevant legal authority to support the causes of action based on Penal Code sections 484 and 496. He also fails to make a prima facie factual

Accordingly, Theodore failed to carry his burden to demonstrate a probability of prevailing on his claims. (See *Taus v. Loftus* (2007) 40 Cal.4th 683, 714 [claim based on protected activity is "stricken if the plaintiff is unable to demonstrate both that the claim is legally sufficient and that there is sufficient evidence to establish a prima facie case with respect to the claim"]; *Contreras v. Dowling, supra,* 5 Cal.App.5th at p. 405 ["'[a]n anti-SLAPP motion is an evidentiary motion'"].)

### 2. *Theodore's Claims Are Barred by the Litigation Privilege*

Mink and the Madisons contend that, even if Theodore had supported his claims, Theodore cannot show a probability of success because his claims are barred by the litigation privilege in Civil Code section 47. Section 47, subdivision (b)(2), creates an absolute litigation privilege, barring all tort claims other than for malicious prosecution based on statements or other communications made in a judicial proceeding. (*Flatley, supra,* 39 Cal.4th at p. 322; *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360, superseded by in part by statute as stated in *Tuomela v. Waldorf-Astoria Grand Wailea Hotel* (D. Haw. Jan. 22, 2021, No. 20-00117 JMS-RT) 2021 U.S. Dist. LEXIS 12634, at *13.) "The principal purpose of [Civil Code] section 47[, subdivision (b),] is to afford litigants . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213.) The privilege also "promotes the effectiveness of

showing. Therefore, Theodore failed to show a probability of success regarding the fifth and eleventh causes of action for violation of Penal Code sections 484 and 496.

judicial proceedings by encouraging attorneys to zealously protect their clients' interests." (*Id.* at p. 214.) "Finally, in immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." (*Ibid.*; accord, *Flatley,* at p. 322.) "To further these purposes, the privilege has been broadly applied." (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 955.)

"The usual formulation [of the litigation] privilege [is that] the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 212; see *Adams v. Superior Court* (1992) 2 Cal.App.4th 521, 529 [litigation privilege bars cause of action "provided that there is some reasonable connection between the act claimed to be privileged and the legitimate objects of the lawsuit in which that act took place"].) "The litigation privilege is absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm. [Citation.] . . . [¶] If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law. [Citation.] Any doubt about whether the privilege applies is resolved in favor of applying it." (*Kashian, supra,* 98 Cal.App.4th at p. 913; see *Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 965 ["[b]ecause Civil Code section 47, subdivision (b) protects any statements or writings that have

57

'some relation' to a lawsuit, communications made both during and in anticipation of litigation are covered by the statute"].)

Moreover, "'communications made in connection with litigation do not necessarily fall outside the privilege merely because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal' assuming they are logically related to litigation." (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 921; accord, *Kashian, supra,* 98 Cal.App.4th at p. 920; see *Jacob B. v. County of Shasta*, *supra,* 40 Cal.4th at p. 956 ["the privilege extends even to civil actions based on perjury"]; *Flatley, supra,* 39 Cal.4th at p. 322 ["[t]he litigation privilege has been applied in 'numerous cases' involving 'fraudulent communication or perjured testimony'"]; *Finton Construction, Inc., v. Bidna & Keys, APLC*, *supra,* 238 Cal.App.4th at pp. 212-213 [the litigation privilege applied to defendant law firm's actions in receiving and retaining an alleged stolen hard drive during a lawsuit until it was turned over pursuant to the court's order in the underlying case]; *Contreras v. Dowling*, *supra,* 5 Cal.App.5th at p. 416 [the court rejected the tenant's argument that the litigation privilege did not apply because tenant was suing landlord's lawyer for conspiracy and aiding and abetting his clients' illegal entries into the apartment]; *Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 20, 22–26 [litigation privilege applied to attorney's misrepresentation of available insurance policy limits to induce the settlement of a lawsuit].)

As the California Supreme Court has recognized, where a privileged communication by an attorney rises to the level of criminal conduct, "other remedies aside from a derivative suit for compensation will exist," including "criminal prosecution under Business and Professions Code, section 6128[,] and State Bar

58

disciplinary proceedings for violation of Business and Professions Code, section 6068, subdivision (d)." (*Silberg v. Anderson*, *supra*, 50 Cal.3d at pp. 218-219, fn. omitted.)

"'A plaintiff cannot establish a probability of prevailing [in responding to a motion pursuant to section 425.16] if the litigation privilege precludes the defendant's liability on the claim.'" (*Bergstein, supra,* 236 Cal.App.4th at p. 814; accord, *Fremont Reorganizing Corp. v. Faigin, supra,* 98 Cal.App.4th at p. 1172; see *Flatley, supra,* 39 Cal.4th at p. 323 [litigation privilege may present a substantive defense the plaintiff must overcome to demonstrate a probability of prevailing].)

Theodore's claims against defendants are based on their communicative conduct in a judicial proceeding to achieve the objects of the litigation. As in *Bergstein, supra*, 236 Cal.App.4th 793, Theodore fails to identify any of defendants' conduct that was not a communication in a judicial proceeding. Theodore's contention that "aiding and abetting," "participating in conspiracy," and "wrongfully taking money" are "non-communicative" conduct is unpersuasive. Aside from failing to provide record citations for the "non-communicative" conduct, Theodore's complaint demonstrates otherwise because it extensively alleged communicative activity throughout. (*Id.* at p. 815 ["[s]imply claiming that 'aiding and abetting [plaintiffs' former attorney's] breach of fiduciary duty and facilitating [that attorney's] breach of contract' is 'non-communicative conduct' does not make it so"].) As the trial court correctly pointed out, Theodore's "allegations and evidence of communications" involved "inseparable communications in furtherance of litigation." Even if defendants communicated improperly, the litigation privilege applies to bar Theodore's claims. (*Kashian*, *supra*, 98

59

Cal.App.4th at p. 920 ["[c]ommunications made in connection with litigation do not necessarily fall outside the privilege simply because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal"].)[27]

Theodore's reliance on *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, *Banuelos v. LA Investment, LLC* (2013) 219 Cal.App.4th 323, and *Kimmel v. Goland* (1990) 51 Cal.3d 202 is misplaced. In *Action Apartment Assn., Inc.,* the California Supreme Court observed that the

---

[27] Wax-Semus's status as an Evidence Code section 730 expert witness and a section 639 referee also precludes Theodore's claims against her because she has quasi-judicial immunity. (*Howard v. Drapkin, supra,* 222 Cal.App.3d at pp. 858-859 ["the justification for giving judicial and quasi-judicial immunity to judges, commissioners, referees, court-appointed persons (such as psychologists, guardians ad litem and receivers), and nonappointed persons (such as those who prepare probation reports and handle child abuse cases) applies with equal force to these neutral persons who attempt to resolve disputes."]; see *Laborde v. Aronson* (2001) 92 Cal.App.4th 459, 463-464 disapproved on another ground in *Musaelian v. Adams* (2009) 45 Cal.4th 512 [litigation privilege bars father's claims against Evidence Code section 730 evaluator in prior custody proceeding]; *Gootee v. Lightner* (1990) 224 Cal.App.3d 587, 591 [father's claims against psychologist jointly retained to provide custody recommendations barred by litigation privilege]; see also *Soliz v. Williams* (1999) 74 Cal.App.4th 577, 589, 591 [judicial immunity "depends on whether [the judicial officer] engaged in the exercise of a judicial function, even if he [or she] acted in excess of his [or her] jurisdiction" because immunity exists for "'judicial actions; those relating to a function normally performed by a judge and where the parties understood they were dealing with the judge in his [or her] official capacity'"].)

litigation privilege did not apply to the "prosecutions" of certain crimes. (*Id.* at p. 1246.) In *Banuelos,* the court held that a cause of action for retaliatory eviction under Civil Code section 1942.5 is not barred by the litigation privilege because the "Legislature presumably would not have included these protections in section 1942.5 if it intended that they be nullified by the litigation privilege." (*Id.* at pp. 325, 336.) In *Kimmel,* the California Supreme Court held, although the litigation privilege "precludes recovery for tortiously inflicted injury resulting from *publications* or *broadcasts* made during the course of judicial and quasi-judicial proceedings," the "noncommunicative acts—the illegal recording of confidential telephone conversations—for the purpose of gathering evidence to be used in future litigation" was not privileged. (*Id.* at p. 205.) The Court pointed out that the recorded-party sought "statutory damages under Penal Code section 637.2 not for injuries arising from the broadcast and publication of private conversations, but from the recording of them." (*Id.* at p. 212.) None of these cases assists Theodore. There was no criminal prosecution, retaliatory eviction claim, or alleged unlawful recording.

## DISPOSITION

The judgments are affirmed.  Mink and the Madisons shall recover their costs on appeal.


DILLON, J.*


We concur:


PERLUSS, P. J.


SEGAL, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.